Argued and submitted May 15, 1981, affirmed in part;
reversed in part and remanded with instructions to enter
a modified decree April 5, reconsideration denied May 13,
petition for review denied July 7, 1982 (293 Or 373)

## HATCHER,
*Respondent,*

*v.*

## UNITED STATES NATIONAL
## BANK OF OREGON,
*Appellant.*

(No. A7709-13488, CA 17421)

643 P2d 359

Charles F. Hinkle, Portland, argued the cause for appellant. With him on the briefs was Stoel, Rives, Boley, Fraser and Wyse, Portland.

Dennis H. Elliott, Portland, argued the cause for respondent. With him on the brief was O'Connell, Goyak & Ball, P.C., Portland.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Plaintiff, a remainderman under an *inter vivos* trust, brought this action for damages resulting from a breach of trust by defendant bank, as trustee. After trial to the court, plaintiff prevailed. On appeal, defendant assigns error to (1) the overruling of its demurrer based on the nonjoinder of other beneficiaries of the trust as indispensable parties to the action; (2) the finding that defendant breached its fiduciary duty to plaintiff as a remainderman under the trust in the sale of the sole trust asset, stock of Staff Jennings, Inc.; (3) the award of damages, in any amount, or, in the alternative, making separate damage awards for the trustee's failing to obtain fair market value for the stock, failing to structure the sale in a prudent manner, agreeing to subordinate its rights, as trustee, under the contract of sale to the defendant bank's commercial loan department and, on a constructive trust theory, "reaping" interest on commercial loans made to the corporation after the subordination, and (4) the award of attorney fees to plaintiff. We review *de novo* and modify the judgment.

### FACTUAL BACKGROUND

In 1963, Stafford H. Jennings established an irrevocable trust for the benefit of five members of his family. The sole trust asset consisted of shares of stock in Staff Jennings, Inc., a closely-held corporation (the corporation) engaged in the retail sale of recreational boats. The corporate headquarters were located near the Sellwood Bridge on the west bank of the Willamette River in Portland; other assets included a warehouse on S. W. Macadam Avenue in Portland and retail stores in Eugene and Springfield.

Defendant became successor trustee in 1966. After the trustor's death in 1968, the trust corpus consisted of 567 shares of stock, representing approximately 78 percent of the outstanding shares of the corporation. Under the terms of the trust, after the trustor's death, his third wife, Olive Jennings, was to receive the net income of the trust, or $8,400 per year, whichever was less, during her life.[1] On

---

[1] The trust agreement authorized the trustee, after the trustor's death and during the life of Olive, either to accumulate any additional income or to

her death and the death of the trustor, the trust corpus was to be divided into four disproportionate shares; 30.06 percent of the corpus was to be distributed to plaintiff, if then living, free from the trust.[2] Plaintiff is the trustor's stepdaughter.

In 1974, the corporation began paying dividends on its stock so that the trust would receive enough income to pay Olive Jennings, who had previously been employed by the company, the yearly income contemplated by the trust. In 1975, the trustor's son, Robert Jennings, was president and chairman of the board of directors of the corporation. At that time, Olive Jennings and Eileen Colhouer were corporate directors. William Stevens, defendant's trust officer primarily responsible for the administration of the trust, was also a director. Aware of the double taxation of corporate dividends, the corporate directors, at a meeting held on September 3, 1975, decided to offer to purchase the 567 shares held by the trust. The stated purpose was to allow the trust to generate income for Olive Jennings without those undesirable tax consequences.

Stevens was present at that meeting and, as a director, approved the purchase by the corporation; however, he abstained from voting on the proposed resolution to offer to purchase the stock, because he, as a member of defendant's trust department, would be reviewing the offer. Stevens thereafter resigned as a director of the corporation and waived the trust's voting rights as of the date the offer to purchase was made. According to the record, that was done to retain capital gains tax treatment for the trust beneficiaries.

The offer by the corporation, of which plaintiff was never notified, was to purchase all of the trust's shares for $800,000, or book value as of December 31, 1975, whichever was greater, with no down payment; the full price, with interest on deferred balances at 8-1/2 percent per annum, was to be amortized by 20 equal annual payments, with the first payment due October 31, 1976. When received by the

---

distribute income in excess of $8,400 to the discretionary income beneficiaries, the trustor's three children: Eileen Colhouer, Robert Jennings and Patricia Jennings.

[2] The other remaindermen are the children of trustor named in n 1, *supra.*

trustee, the offer was submitted to a financial analyst, an employee of defendant, with the assigned task of determining whether the offer was "satisfactory"; he was not asked to do an independent evaluation of the net worth of the corporation and did not do so. On the basis of what he did do, considering the book value (using the tax assessor's values for real estate), the price-earnings ratios and yield, he reported to defendant's trust management committee that the offering price was fair and reasonable. Stevens checked the interest rate with defendant's commerical department and was advised that 8-3/4 or 9 percent would be "a better interest rate and more in line with present loan requirements." Stevens recommended an interest rate of 8-3/4 percent to the trust management committee, which approved the sale with that change.

The trustee then made a counter-offer to the corporation, the only change from the original offer being an increase in the interest rate to 8-3/4 percent. That offer was accepted by the corporation and incorporated in a stock purchase agreement dated September 24, 1975.

Evidently, book value was less than $800,000 by the end of the year; therefore, under the agreement the purchase price of the stock was $800,000. The only security for the price was a pledge of the stock. Under the pledge agreement, the trustee was required to release the number of shares, the unit price of which equalled the dollar reduction of the principal balance each year, with some restrictions.[3] No controls were placed on salaries or dividends paid by the corporation or on the corporation's borrowing or mortgaging its assets. The trustee waived its voting rights in the pledged stock prior to a default under the stock sale agreement.

After the sale was completed, defendant's commercial department learned of the redemption by the corporation, a debtor of the defendant *qua* bank. It was concerned

---

[3] The pledge agreement provided in part:

"(1) The Bank shall have the right to request a copy of current financial statements of Staff Jennings, Inc. prior to any release of stock. No release of stock held as security shall cause the book value of remaining stock held as security to be less than the outstanding principal balance to be paid under the terms of the Stock Purchase Agreement signed of even date herewith."

that the new $800,000 liability which had been created substantially decreased the corporation's net worth, making it a poor credit risk. The corporation was unable to obtain working capital elsewhere, and defendant's commercial department eventually threatened to terminate its line of credit to the corporation, effective June 1, 1976. Further negotiations led to a plan whereby the line of credit would be extended, if the trustee would agree to subordinate the trust's contract rights to payment for the stock to the commercial department's line of credit. The proposed subordination required the consent of the commercial department of defendant to any payments made by the corporation on the contract to the trustee.

The trustee notified the four income beneficiaries and plaintiff of the subordination proposal, but did not consider their consent necessary. Stevens executed the subordination agreement on behalf of the trustee without plaintiff's consent, after obtaining a concession from the commercial department that the corporation would be permitted to pay $10,000 per year without consent. That concession permitted the corporation to make payments to the trustee sufficient to pay Olive Jennings the income contemplated by the trust agreement and to pay taxes and administrative expenses.

In September, 1977, Olive Jennings and plaintiff filed an action against the trustee, Robert Jennings and the corporation. After Olive Jennings died in 1978, plaintiff filed an amended complaint and took an order of voluntary nonsuit against Robert Jennings and the corporation. In the fifth amended complaint, plaintiff alleged that defendant had breached its trust (1) by failing to sell the assets of the trust at fair market value; (2) by failing to follow prudent business practices in structuring the interest rate, security and payment terms, and (3) by negotiating the subordination agreement contrary to prudent business practices and as an act of self-dealing. Plaintiff sought damages for each of the alleged breaches.

The trial court did not make findings of fact, but it did issue a letter opinion in which it ruled that plaintiff was entitled to damages in each particular requested and was also entitled to damages, on a constructive trust

theory, for interest earned by the commercial department of the bank in making loans to the corporation after the subordination.[4] The trial court also awarded plaintiff attorney fees in the amount of her contingent fee arrangement with her attorneys, in order to "make the plaintiff whole."

## NONJOINDER OF PARTIES

■    In the first assignment of error, defendant contends that the trial court erred in overruling its demurrer to the fifth amended complaint, filed the day before trial, on the ground that the other beneficiaries of the trust were indispensable parties, because without them a "complete determination of the controversy" could not be had. *See* former ORS 13.110 (repealed by Or Laws 1979, ch 284, § 199).[5]

The face of the fifth amended complaint indicates the existence of only one other beneficiary, Robert Jennings. The question, then, is narrowed to whether he was a necessary party. The original complaint did name him as a defendant, but a voluntary nonsuit was taken as to him and the corporation, leaving only the trustee as a defendant in the fifth amended complaint. The allegations relating to Robert Jennings, on their face, make it clear that he

---

[4] The letter opinion set forth the damages awarded as follows:

"1. Plaintiff's first cause of suit:

"(a) Damages to plaintiff resulting from failure of defendant trustee to obtain fair market value for stock owned by trust: $114,603.14.

"(b) Damages to plaintiff resulting from failure of defendant trustee to prudently structure sale of stock owned by trust: $68,058.00.

"2. Plaintiff's second cause of suit:

"(a) Damages to plaintiff resulting from failure of defendant trustee to act as a reasonably prudent trustee in negotiating subordination agreement: $32,862.00;

"(b) $111,222.00 representing 30.06% share of the interest received by defendant from Staff Jennings, Inc. from subordination to November 1, 1979, which interest payments were made possible as a result of the breach of trust and self dealing by defendant."

[5] Former ORS 13.110 (repealed by Or Laws 1979, ch 284 § 199) provided:

"In actions or suits the court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy can not be had without the presence of other parties, the court shall cause them to be brought in."

benefitted from the questioned sale of the stock, because it enabled him to gain control of the corporation. It is also apparent from those allegations that he consented to the sale by participating in the transaction as the president and a director of the corporation. His interest was to uphold the trustee's action in connection with the sale.

Given that limited inquiry on those allegations, and the fact that plaintiff seeks only damages which she claims she suffered as a result of the trustee's conduct, we think it is clear that the controversy may be determined without his presence as a party. Defendant does not contend that it raised the nonjoinder question during trial after it became apparent that there were other beneficiaries, or that the trial court, *sua sponte,* should have required joinder of the others. *See Wood et al. v. Honeyman et al.,* 178 Or 484, 169 P2d 131 (1946). Although we could remand for the purpose of joining other parties, *Beers v. Beers, Administratrix,* 204 Or 636, 283 P2d 666 (1955), we are not asked to do that and do not consider it necessary in this case.

We find no error.

## BREACH OF TRUST

Some elaboration of what is said in the factual background portion of this opinion is needed to explain our conclusion that defendant breached its fiduciary duty in all of the respects claimed.

The trustee's duty of care is described in the trust agreement itself:

> "Trustee shall not be liable for any loss resulting to the Trust Estate unless the same results from negligence on the part of the Trustee or from want of reasonable care and caution in the management and control of the Trust Estate."

ORS 128.057 imposes a similar prudent person standard on fiduciaries:

> "* * * In managing property for the benefit of another, a fiduciary shall exercise the judgment and care under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard

to the permanent disposition of their funds, considering the probable income as well as the probable safety of the capital. * * *"

In Restatement (Second) of Trusts, § 227, Comment d, an additional requirement is suggested for corporate trustees:

"If the trustee is a bank or trust company, it must use in selecting investments the facilities which it has or should have, and it may properly be required to show that it has made a more thorough and complete investigation than would ordinarily be expected from an individual trustee."

1. With respect to whether defendant's sale of the stock at the price offered by the corporation was a breach of trust, plaintiff contends that defendant not only failed to take the steps a reasonably prudent person, in the management of his own affairs, would take in evaluating an offer to purchase the sole trust asset, but also failed to obtain a reasonable price.

The first inquiry is whether defendant fulfilled its fiduciary duty to determine whether the price offered for the stock represented its fair market value. From what has already been related, it seems apparent that it did very little; it did not even utilize its own analysts to determine the fair market value of the corporation. Not only did the trustee fail to obtain an independent appraisal of the corporation's real estate, but it did not even use its own real estate appraisers. Defendant made only two specific inquiries to its staff: (a) was the offer "satisfactory," and (b) was the interest rate appropriate? It did not attempt to negotiate any of the terms of the offer, other than to raise the proposed interest rate from 8-1/2 to 8-3/4 percent, which was the lower rate recommended by defendant's commercial department.

The trustee made no effort to test the market. At no time did the trustee attempt to determine if anyone other than the corporation was interested in purchasing the stock. Defendant attempts to explain away that lack of effort by contending that keeping the stock within the family was the paramount consideration. The trust agreement, however, did not restrict the sale of the trust assets to members of the trustor's family or grant the beneficiaries or the corporation the right of first refusal; it did not

even suggest that the trustee consider family relationships in selling any of the assets. That is not to say that a sale within the family may not be a relevant consideration where the asset to be sold is a controlling interest in a closely-held family corporation. *See Holt v. Rice,* 282 Or 203, 210, 578 P2d 393 (1978). Absent some direction from the trustor, however, it is not "of paramount importance." The point here is not that the trustee was *required* to sell to an outsider, but that it had a duty to determine the fair market value of the stock, which it could have done through appraisals or by "testing the market" to determine what a willing buyer was willing to pay. Defendant did neither.

■       In *Rippey v. Denver United States Bank,* 273 F Supp 718, 739-40 (D Colo 1967), the asset sold was a large block of stock of a major newspaper. The court held that the trustee had committed a breach of trust by not investigating the market further before selling the stock to a favored client; it was known that the owner of a large chain of newspapers was interested in acquiring the stock and might have paid much more. Defendant points out that *Rippey* was a different situation, because in that case there was a *known* available buyer. That is true; however, plaintiff in this case introduced evidence that the corporation's largest competitor in Oregon would have at least considered purchasing the stock if he had been approached, and a broker testified that he believed he could have generated interest in other prospective purchasers. Testing the market is not limited to consideration of offers volunteered by actual, potential buyers. If that were the measure of a trustee's duty, he would not breach it unless he ignored such offers. A trustee's fiduciary duty to exercise prudence is not a passive one. Given the fact that defendant did not make a thorough appraisal of the value of the stock, it should have at least tested the market.

Robert Jennings obtained an option to purchase the shares of Eileen Colhouer, which, if exercised, would give him a majority of the outstanding stock. He is the only beneficiary of the trust who also benefitted from the sale of the stock on the agreed terms. He testified at trial that, within reason, he would have done everything possible to keep the stock from going to an outside party. Thus, it

appears probable that the trustee should have been able to negotiate a better price, and certainly better terms, from the corporation for the trust's controlling interest — particularly if the trustee had done its homework.

It appears to us that defendant did not do its homework. The procedures used by its financial analyst in the evaluation of the corporation's offer to purchase were cursory at best. The evaluation made at time of the sale used a price-earnings multiple approach which, the analyst conceded at trial, did not take into account the value of the real estate. He explained that he was not requested to make a thorough evaluation of the operation, but only to determine whether the price was "satisfactory." In a review of the original valuation prepared for trial, that analyst relied on the tax assessment and book values to determine the fair market value of the real estate, rather than utilizing a real estate appraisal, either done internally by defendant's staff real estate appraisers or by an independent appraiser. At trial, the trust officer had no explanation for not having had a real estate appraisal conducted by defendant's staff.

Plaintiff's real estate expert, an appraiser who had made a preliminary appraisal of the real property, testified that commercial property is generally substantially under-assessed, because, although the assessor attempts to assess at 100 percent of value, *see* ORS 308.232, it is difficult to keep up with inflation and appreciation. At trial, defendant's analyst attempted to correct that deficiency by adding an arbitrary 15 percent to the assessed value to bring it "closer to what it was probably worth." Nonetheless, his revised valuation was substantially less than that of plaintiff's appraiser.

As plaintiff points out, the trustee's evaluation also failed to take into account any enhancement in the value of the block of stock held by defendant, because it represented a 78 percent controlling interest in the corporation. The methods used by the defendant's financial analyst treated the sale of stock as if it were nothing more than that, rather than a sale of a going business. Further, the trustee's evaluation attributed no value to the goodwill of the corporation, even though the corporation had been in business for almost 50 years and had an excellent reputation in the business community.

At trial, another witness called by plaintiff, a vice-president of Seattle First National Bank and manager of its trust department section monitoring closely-held businesses, testified that a reasonable trustee in defendant's position should consider its control position paramount, because that controlling interest includes the power to liquidate, and the liquidation value would set a ground floor for value. (There was, however, no evidence here of the corporation's liquidation value as such.) That expert testified that before selling a controlling interest, a trustee should obtain an outside appraisal of any real estate, try to find third parties interested in buying the stock and make its decision based upon which kind of sale would produce the best value to the trust estate. Defendant, on the other hand, presented no independent testimony as to what a prudent person should have done in this situation.

In support of the sale at the offered price, defendant's financial analyst presented at trial a valuation based on averaging five methods: book value, adjusted book value, the "McClellan" method (using earnings, book value and actual dividends), the "Bader" method (using dividend capacity, earnings and book value), and the "Alternative" method (using earnings, dividend capacity and adjusted book value). Those analyses, made for the purpose of trial, also neglected to consider the control factor, goodwill and fair market value of the real estate.

Plaintiff established through her expert witness that the fair market value of the corporation as a going concern was $1,500,000 at the time the trustee sold its shares. That appraisal took into account the fair market value of the corporation's real estate holdings, the control position held by the trustee and the value of the goodwill. Plaintiff's expert's opinion of value was based on an average of the values resulting from utilizing seven different methods for approximating the fair market value of a business: book value, adjusted book value, book value plus goodwill, capitalization of earnings, price earnings ratios, capitalization of earnings with regard to productivity and discounted future earnings.

On appeal, defendant challenges the real estate values used by plaintiff, because they are based on a

preliminary appraisal premised, in part, on what might have been erroneous information. Defendant called as a witness Robert Jennings, who testified that one acre of the real property near the Sellwood Bridge was actually underwater, that the Sellwood property was located over a fault line, that one building on that property was subject to dry rot and at time of trial was slated for removal, and that the property neither had a moorage nor the potential for one, contrary to an assumption made by plaintiff's real estate appraiser. Defendant, however, made no attempt at trial to ascertain what difference those facts, if true, would have made in plaintiff's expert's estimate of the value of that piece of property; no questions designed to elicit that information were put to plaintiff's expert on cross-examination. Defendant offered no independent real estate appraisal of its own, preliminary or otherwise.

The record persuades us that plaintiff's evidence of the fair market value of the corporation is more accurate than that of defendant. The appraisals offered by plaintiff were more thorough than those of defendant and took into account all of the relevant factors, which defendant failed to do. Accordingly, we accept, as did the trial court, plaintiff's overall appraisal as a reasonable valuation of the corporation's fair market value when the stock was sold.

■ Accepting that valuation, the trust's block of stock was worth $1,181,250 — over $300,000 more than the trustee obtained for it. We conclude that the acceptance of the corporation's offer, without any effort to determine if there were other potential buyers, without appraising the real estate and without taking into account important factors such as the controlling interest to be sold and value of the goodwill, was imprudent. Defendant breached its trust by failing to obtain fair market value for the sale of the sole trust asset, to the loss of plaintiff, the only beneficiary who did not approve or consent to the sale.

■ 2. With respect to the structuring of the sale, several considerations lead us to the conclusion that the trustee acted imprudently in accepting the terms of the corporation's offer, quite apart from the reasonableness of the price. No money was paid down, payment was to be in equal annual payments over a 20-year period and the only

security was the pledge of the stock without voting rights. There were no restrictions on salaries or on the payment of dividends which could be paid; the corporation was free to mortgage all of its assets and to incur indebtedness in any amount at any time. It is apparent that the stock could be rendered essentially valueless by the corporation, and the trustee's only remedy would be to exercise its rights under the pledge agreement if the corporation defaulted on its payments. On top of that, the pledge agreement required the trustee to release shares from the pledge with each annual payment.

The terms also included an interest rate of 8-3/4 percent. Dr. Shannon Pratt, a dividend financial analyst and certified financial planner, testified that, given the lack of security and long pay-out period, an interest rate range of 13 to 17 percent on the principal balance was appropriate. We note that at trial defendant did not call the person in the commercial department who advised Stevens that an 8-3/4 to 9 percent interest rate was "more in line with present loan requirements"; we do not know whether that source had been told of the other unfavorable terms of the contract. In contrast to the interest rate provided in the stock purchase agreement, the corporation had paid 13.2 percent on a line of credit from Westinghouse Credit Corporation that was fully secured by the inventory purchased with the loan proceeds. Defendant's commercial department charged the corporation over 10 percent on *short-term* loans fully secured by mortgages on the real property and security interests in the inventory and contracts receivable.

We conclude that the trustee breached its fiduciary duty by imprudently structuring the sale.

3. With respect to the trustee's subordinating its right to payment for the stock to the commercial department's line of credit, defendant contends that it had no choice but to execute the subordination agreement, given the ultimatum of the commercial department. Although that may be true as the circumstances developed, a prudent corporate trustee, at the time the sale was negotiated, should have anticipated that the creation of the $800,000 liability by the corporation would present a serious problem to the corporation's ability to obtain an operating line of

credit and should have known that some sort of subordination of the trustee's right to receive payments would be necessary. Here, Stevens knew that the bank was the corporation's principal lender; he had been a director of the corporation for several years. The effect on the trust of some form of subordination should have been considered in negotiating the sale.

Having defaulted in its duty in that respect, the trustee, plaintiff contends, should have attempted to remedy its default by obtaining additional compensation from the corporation at the time the subordination agreement was negotiated. Not only did the subordination place the trust in a position inferior to the defendant's commercial department as a creditor of the corporation, but the agreement gave that department the power to withhold consent for each annual payment, without any guidelines for determining under what circumstances consent would be given or withheld. Furthermore, if the contract payments were not made because the commercial department refused to consent, it is highly doubtful that the trustee could declare the contract in default which, in turn, would mean that it not only could not proceed to exercise its rights on default, but would probably not be in a position to vote the pledged stock under the terms of the agreement by which it waived its voting rights in the absence of default.

At trial, Stevens admitted the possibility that the commercial department could arbitrarily withhold consent and prevent the trust from receiving the contract payments, but he did not even consider asking for additional consideration from the corporation.

■ We conclude that the trustee breached its fiduciary obligation in failing to consider the probability of being required to subordinate, in some manner, its right to receive contract payments, when it "negotiated" the sale of the stock and, later, when it was actually confronted with the problem, in failing to obtain some additional consideration for the subordination.

## DAMAGES

The trial court awarded plaintiff damages in four categories: (1) the difference between the fair market

value of plaintiff's share of the trust corpus and her share of the amount obtained by the trustee; (2) for the trustee's failure to structure prudently the sale of the stock; (3) for the trustee's failure to negotiate prudently the subordination agreement, and (4) plaintiff's proportionate share of the interest received by defendant's commercial department from the corporation following the trustee's subordinating to that department. Each of the four categories is discussed below.

■ (1) Defendant does not contend that this portion of the damage award is not based on a proper measure, but only that the evidence does not support any award of damages, even if there was a breach of duty by defendant. We have already considered much of the evidence on that question in discussing defendant's breach of trust in failing to sell the stock at its fair market value. We concluded that plaintiff's evidence of fair market value is more accurate than that of defendant's. That evidence is sufficient to determine that defendant sold the stock for $381,250 less than its fair market value. Had defendant obtained that additional amount, plaintiff's share would have been worth $114,603.14 more, the amount of damages awarded by the trial court. We affirm that award.[6]

(2) Plaintiff claimed that because of the imprudent structuring of the sale by defendant, her interest in the contract had a market value substantially less than its face value. The trial court awarded damages measured by the difference between the interest rate the defendant should have obtained and that which it did obtain. Defendant contends that plaintiff is not entitled to damages on either theory.

■ Without repeating what has been said with respect to defendant's structuring of the sale, including the inadequate security and interest rate, it is sufficient to point out that even if defendant had obtained the fair market value

---

[6] Defendant does not contend that if any award of damages is appropriate, the judgment should not require defendant to pay the amount in a lump sum, but should provide for annual payments, with interest, over the remaining period of the contract with the corporation. We do not, therefore, consider any modification of the judgment and decree in this respect.

for the stock, the structuring of the sale reduced the marketability and value of plaintiff's interest in the contract. That loss, if measurable and supported by the evidence, is separate from the damages awarded under the first category. Plaintiff adduced expert testimony in support of both theories.

Arthur Berry, vice-president of a large Idaho investment corporation involved in purchasing real estate investments, testified that, because of the terms of the sale, the contract to repay the $800,000 price had a present worth between $191,178 and $245,338. Using the higher value, the difference between $245,338 and $800,000 is the amount of the value defendant failed to obtain as a result of the imprudent terms of sale. Plaintiff's share of that loss is $166,398. In other words the value of plaintiff's present interest in the contract was reduced by that amount.

Dr. Pratt, another of plaintiff's expert witnesses, testified that a 15 percent interest rate was reasonable given the lack of any down payment, the long pay-out period and the lack of security. The failure of defendant to obtain that rate resulted in a loss to plaintiff in the amount of $68,058, which Dr. Pratt testified was the present value of plaintiff's share of the additional interest that defendant should have charged and received over the remaining 17 years of the contract.

In our opinion, the record supports either theory, and the trial court chose that which produced a lower award to plaintiff. Plaintiff has not cross-appealed, and defendant has no cause to complain. We affirm the award.

(3) Defendant contends that there should be no damages for its having executed the subordination agreement after the stock sale contract was executed, because, it contends, it had no choice in the matter and, in any event, plaintiff failed to prove any damage caused thereby. With respect to the first point, assuming that defendant had little, if any, choice but to accede to reasonable demands made by the lender who provided the open line of credit to the corporation, that circumstance should have been anticipated at the time the stock sale was made and taken into account in structuring the terms of the sale. Because it was

not, plaintiff's experts testified that the trustee should have obtained some consideration from the corporation at the time the subordination agreement became necessary for the corporation to continue operating.

The more difficult question is whether plaintiff has shown any damage flowing from the trustee's neglect. It is important to note that the contract of sale was secured only by a pledge of the stock being sold; there were no restrictions on what the corporation could do with its properties. Therefore, when the corporation gave the bank's commercial department first security interests in the corporate assets, the trustee had no right to complain, because the corporation had the right to do so. When the trustee signed the subordination agreement, its position was not changed in that respect — the commercial department already had, or had the right to obtain, prior security interests in those properties.

However, that portion of the subordination agreement which prohibited the corporation from making any payments in excess of $10,000 per year to the trustee under the stock sale contract without the consent of the commercial department could have a substantial impact on the trustee's rights, including the right to declare a default if the corporation were not permitted to make payments in excess of $10,000. That part of the agreement might well have an impact on the value of the stock sale agreement, as plaintiff contends.

The question is whether plaintiff has proved the extent of that impact. Arthur Berry testified that the subordination agreement rendered the contract unpurchaseable because (1) it subordinated payments on the contract to all past and future indebtedness to the commercial department; (2) it rendered the cash flow suspect, because payments on the note had to be cleared by the bank, and (3) the provision in the waiver of voting rights agreement giving voting control over the corporation to the trust in the event of a default lost its effect as a result of the subordination agreement. Mr. Berry testified that the effect of the subordination agreement was to render the value of the contract so speculative that a price could not

be quoted based on its annual yield, and that the note was only purchaseable on a salvage basis.[7]

■ Dr. Pratt also testified on this question. He expressed the opinion that the subordination significantly increased the risk under the contract, in consideration of which the defendant should have obtained an increase in the interest rate on the stock sale agreement. Dr. Pratt compared the note before subordination to a low B-rated bond, defined in Standard and Poor's Bond Guide (October, 1975) as "speculative," where payment of interest could not be assured under difficult economic conditions. After subordination, Dr. Pratt said the note was comparable to a CCC- or CC-rated bond, defined as being an "outright speculation," where continuation of interest was questionable in periods of poor trade conditions. In his opinion, as a result of that devaluation, an additional 5 percent in the interest rate should have been obtained. It was on that basis that the trial court awarded plaintiff $32,862. The testimony of both experts was consistent in supporting the proposition that the contract, after subordination, was highly speculative as an investment. They differed as to how much that speculativeness affected the value of the contract, and the trial court awarded damages based on the evidence of less damage. We affirm the award.

■ (4) The trial court awarded damages for plaintiff's *pro rata* share of the interest or "profit" earned by defendant in its capacity as commercial lender on loans made to the corporation after the trustee had agreed to the subordination agreement, an act which the trial court characterized as a breach of trust and an act of "self-dealing." The complaint did not allege a claim for damages based on that theory or seek to impose a constructive trust on the interest earned by the bank. That claim was first

---

[7] Defendant contends that on cross-examination Berry conceded that if the commercial department was a secured creditor, the subordination would have no effect on the value of the contract. That is a substantial overstatement. We understand the witness to have been referring to the effect of the subordination on priority with respect to the assets given the bank as security. It is true that the trustee had no security interest in those assets, so it had nothing to subordinate with respect to them. The expert's testimony taken as a whole demonstrates that he considered the commercial department's priority in payment and its control over the annual contract payments to be the reasons he thought the contract was rendered speculative.

asserted in a supplemental memorandum of law filed three weeks into trial; plaintiff did not amend her pleadings to reflect that claim. Defendant contends that the award of damages under this category was improper, because it was outside the scope of the pleadings; plaintiff contends that the award was within the general equitable power of the trial court. Assuming *arguendo* that plaintiff is correct, we hold that there was no basis here for the award.

As we have already observed, the breach of trust with respect to subordination consisted of the trustee's failure to anticipate the need for subordination of some sort and to obtain additional compensation from the corporation at the time the stock purchase agreement was negotiated, or to obtain additional compensation when the subordination was requested. Damages for the failure to obtain compensation for the detriment to plaintiff's interest in the trust corpus are already covered under the third category of damages. That breach does not constitute a separate additional wrong involving "self-dealing." Moreover, the interest paid to this lender on loans it made to the corporation did not constitute profits resulting from the trustee's breach, for the corporation could not have avoided paying interest on loans obtained from any other lender. The subordination agreement is relevant to the bank loans only in the sense that without it the corporation could not have obtained the line of credit it needed, whether from defendant bank or some other lender.

This case is not one where the trustee profited, *qua trustee,* through the improper disposition of trust property. *See* Restatement (Second) of Trusts, § 205, Comment g (1935). It is clear that the corporation needed an open line of credit and would have been required to pay interest on that line to some lender. There is no contention that the trustee required the corporation to borrow from defendant's commercial department or that it was even instrumental in arranging that line of credit. To the contrary, the record indicates that the corporation was unable to obtain all of the credit it needed from other commercial lenders.

We conclude that awarding damages for gains from self-dealing was improper. The award of $111,222 for

plaintiff's share in interest payments received by defendant was error, and that part of the judgment is reversed.

## ATTORNEY FEES

Finally, defendant challenges the award of attorney fees to plaintiff, because (1) they were not properly pled, being mentioned only in the prayer contained in plaintiff's reply, (2) they were not authorized by contract, statute or case law, and (3) an award based on a contingent fee arrangement was improper. We agree with defendant's second point and hold the award should not have been made.

There is no contractual or statutory basis for the award of attorney fees in this case. This action is not a derivative one, *see, e.g., Gettings v. City of Elgin,* 16 Or App 140, 142, 517 P2d 686 (1974), or a case of constitutional significance benefitting the public interest. *See, e.g., Deras v. Myers,* 272 Or 47, 66, 535 P2d 541 (1975). The only authority in Oregon for recovery of attorney fees in an action for breach of trust brought by a beneficiary requires that the action be maintained for the preservation or increase of a common fund in which other beneficiaries are entitled to share. In *Kinney v. Uglow,* 163 Or 539, 584, 98 P2d 1006 (1940), the Supreme Court, quoting from an ALR annotation (107 ALR 749, 750 (1937)), stated:

> " 'The later cases support the general rule stated in the original annotation, that it is proper for a court exercising equitable jurisdiction to make an allowance of a reasonable fee out of the fund or property created or preserved, for an attorney representing a party who, at his own expense, has maintained a suit for the recovery, preservation, protection, or increase of a common fund or common property, or has created or brought into court a fund in which others are entitled to share.' "

*Accord,* Annot., 9 ALR2d 1132, 1150-56 (1950). In *Kinney,* two of several life beneficiaries of a trust instituted suit for an accounting and ultimately prevailed on their objections to certain investments. The court held that the plaintiffs were entitled to attorney fees, because other beneficiaries benefitted as a result of the litigation. The *Kinney* common-fund rationale for attorney fee awards was applied in *Cloud v. U. S. National Bank,* 280 Or 83, 92, 570 P2d 350 (1977), where the plaintiff prevailed on a claim that the

trustee had breached its trust by honoring the withdrawal of $20,000 from a revocable trust by an obviously incompetent trustor. Because the plaintiff succeeded in compelling the trustee to reimburse the trust fund, thereby benefitting the other beneficiaries, the court held that the plaintiff was entitled to reasonable attorney fees to be paid from the trust corpus.

The rationale of allowing attorney fees out of the common fund in such cases is that the one who incurred the expense for the benefit of others, as well as himself, ought not to be required to bear that expense alone; all of those who benefit should bear their proportionate share. That result is accomplished by allowing the expense to be paid out of the fund.

That is not the case here. Plaintiff has not sought to benefit any other beneficiaries of the trust. Indeed, in arguing that no other beneficiary is an indispensable party to this action, plaintiff asserts that she sought damages "only for the amount by which the value of her percentage interest in the trust had been diminished or harmed by the actions of the trustee." Under the terms of the trust instrument, the trust continues for the life of Patricia Ann Jennings, daughter of the trustor, with remainder interests in plaintiff, Eileen Colhouer and Robert Jennings, or their issue. However, in this action, plaintiff has not sought to increase the value of that portion of the trust corpus, although she could have done so. Rather, she has expressly limited her claim to the decrease in value of her own immediate distributive share. Thus plaintiff has not attempted to bring a common fund into court or to augment the trust corpus; this action and her recovery are purely personal to her. To award her attorney fees here would not require other beneficiaries to pay their proportionate share, but would require the trustee to pay them individually. That may be an equitable result, but we know of no authority for that kind of an award. Accordingly, we reverse that portion of the judgment awarding plaintiff attorney fees.

The judgment is affirmed in part and reversed in part, and the case is remanded with instructions to enter a modified decree (1) deleting from the award of damages in

the second cause of suit the amount of $111,220, representing a share of interest payments received by defendant from Staff Jennings, Inc., subsequent to the subordination and (2) deleting the award of attorney fees to plaintiff in the amount of $130,698.05.

Affirmed as modified.