Argued and submitted March 15, affirmed on appeal; on cross-appeal, reversed and remanded with instructions; otherwise affirmed, Bank of California's reconsideration and Wadsworth's reconsideration denied August 25, both petitions for review denied November 30, 1989 (308 Or 593)

## WADSWORTH et al,
*Respondents - Cross-Appellants,*

*v.*

## BANK OF CALIFORNIA,
*Appellant - Cross-Respondent.*

In the Matter of

## THE HOMER G. WADSWORTH TRUST

(A84-08-04590; A85-09-06074; CA A48524)

777 P2d 975

Peter C. Richter, Portland, argued the cause for appellant - cross-respondent. With him on the brief was Miller, Nash, Wiener, Hager & Carlsen, Portland.

Ronald H. Hoevet, Portland, argued the cause for respondents - cross-appellants. On the briefs were Shari Jo Clark, Les Wellman and Hoevet, Snyder, Neuberger & Miller, Portland.

Before Joseph, Chief Judge, and Riggs and Edmonds, Judges.

RIGGS, J.

## RIGGS, J.

Defendant trustee appeals from a judgment in which the trial court ordered it to pay damages to the trust for breaches of fiduciary duty. Plaintiffs, who are all but one of the beneficiaries of the Homer G. Wadsworth Trust (the trust), cross-appeal, asserting that the trial court applied the wrong measure of damages and that it erred in not awarding them attorney fees and in not requiring defendant to repay the trustee fees that it had received. We affirm on the appeal. On the cross-appeal, we remand for the trial court to enter a judgment requiring defendant to repay the trustee fees and for an award of attorney fees.

Plaintiffs are the widow and all but one of the children of Homer G. Wadsworth (Wadsworth).[1] In 1966, Wadsworth established the trust, with defendant as the trustee. He died in March, 1972; the trust was the residual beneficiary of his estate. Wadsworth had been the president and majority shareholder of the Bank of Oregon; the primary asset of the estate was his bank stock. In August, 1972, plaintiff Mary Wadsworth (Mary), his widow, who was the personal representative of his estate and the sole income beneficiary of the trust during her life, agreed to sell 6120 shares of Bank of Oregon stock to Spike for $547,801.20, or $89.51 per share, with 6 percent interest on the unpaid amounts. Spike agreed to make a down payment of $30,000 and monthly payments of $2950, which would constitute the trust's primary income.

The contract provided that the stock would be reissued in Spike's name, but he was required to deliver it to the trustee as collateral to secure his payment of the purchase price. The contract contained this provision:

> "The buyer [Spike] agrees not to transfer any share of the stock reissued in his name until *the entire purchase price of the share has been paid* and to transfer no such paid shares unless the book value of the unpaid shares equals or exceeds the then unpaid remainder of the purchase price. The buyer further agrees to deposit the stock certificate reissued in his name with the seller as collateral security for payment of the

---

[1] The remaining child and beneficiary, Homer G. Wadsworth, Jr. (Spike), is a defendant but is not a party to this appeal. Throughout this opinion, "defendant" refers to The Bank of California.

remainder of the purchase price. The seller agrees to release the shares for transfer by the buyer *when the per share price has been paid, the book value security requirement is then met and the buyer requests release of the shares for transfer."* (Emphasis supplied.)

The Bank of Oregon split its stock and issued stock dividends several times after the execution of the contract, both before May, 1974, when the estate was closed and the assets were transferred to defendant as trustee of the trust, and in the following years. In 1981, Bank of Oregon stock was exchanged, as part of a corporate reorganization, for shares of BanOre Bancshares, Inc. (BanOre), a holding company. By 1984, when plaintiffs filed this action, it would have required well over 200,000 shares of BanOre to represent the 6120 shares of Bank of Oregon stock that Spike purchased.[2]

The record does not show how many shares of Bank of Oregon stock defendant received in the distribution of the estate. In August, 1974, defendant calculated that it needed 74,000 shares at the then current book value to provide adequate collateral for the contract. It released the rest of the shares in its control to Spike and did not seek to determine whether he held additional shares that should have been part of the collateral. Defendant did not attempt to determine whether Spike had paid the equivalent of $89.51 per original share for the shares that it released to him.

Defendant released additional shares to Spike several times during the 1970s and early 1980s. In doing so, it considered only whether the shares remaining after each release had a book value equal to the remaining balance of the contract, not whether Spike had paid the full contract value for the shares that it released. Defendant also did not collect the stock dividends that the Bank of Oregon declared on the shares that defendant had previously released to Spike. Defendant last released stock in July, 1982. The next May, Spike failed to pay the full monthly payment; he made no payments at all after November, 1983. In early 1984, Spike's creditors placed him in involuntary bankruptcy, as a result of which his obligations under the contract were discharged. At

[2] All references to numbers of shares relate to shares as of the time that we are discussing in that particular part of the opinion; we do not attempt to adjust the numbers to reflect some constant measure.

the time of the default and the bankruptcy petition, the trust held as collateral 47,000 shares of BanOre, which was 160,886 fewer than it would have held if it had released only the shares for which Spike had paid the contract price.

In January, 1984, defendant stopped paying income to Mary, because there was no income to pay. It did not sell the BanOre stock, because it believed that the costs of sale would be greater than the proceeds. However, between that date and the trial, BanOre sold the Bank of Oregon, which had become insolvent, and worked out a plan to liquidate its other assets for an amount that would provide stockholders at least $1.23 per share.[3]

The trial court held that defendant had breached its fiduciary duty each time that it had released stock for which Spike had not paid the full contract price and that the proper measure of damages was what the missing shares would be worth at the time of trial, if the trust had still held them. It entered judgment for plaintiffs for $197,889.78. The issues on appeal and on cross-appeal focus on those determinations.

**1.** Defendant first asserts that the trial court erred in construing the stock purchase contract. The contract requires the seller to release shares held as collateral to Spike "when the per share price has been paid, the book value security requirement is then met and the buyer requests release of the shares for transfer." The trial court agreed with plaintiffs and held that the contract establishes three conditions for the release of the shares: 1) Spike must have made principal payments equal to the full value of each share to be released ($89.51 per original share); 2) the shares remaining after the release must be sufficient, at book value, to cover the balance of the purchase price then outstanding; 3) Spike must have asked for release of the shares.

Defendant argues that it correctly construed the agreement to permit releases if the remaining shares had a book value equal to the remaining balance on the contract

---

[3] Defendant argues that the amount that stockholders will receive on liquidation is too uncertain to be the basis for determining the value of the shares. We disagree. The preponderance of the evidence is that, at the time of trial, $1.23 per share was the minimum that would be available after deducting one small remaining contingency and the expenses of winding up. Defendant does not assert that the court should have valued the stock as of some other date.

without regard to the amount of principal that Spike had paid. Spike testified at trial that his understanding was the same as defendant's and that the lawyer who wrote the contract had had the same understanding at the time. We agree with the trial court's construction. Although the contract is not a model of draftsmanship, its unambiguous language, particularly in the light of the requirement in the same paragraph that Spike not transfer any share "until the entire purchase price of the share has been paid," makes it clear that the bank's construction is wrong. Even if the language were ambiguous, Mary and the lawyers who drafted the agreement, including the lawyer on whose advice Spike claimed to have relied, testified that their understanding of it was the same as that that the court adopted. That evidence of the parties' intent is more convincing than that on which defendant relies. The trial court correctly construed the contract. Defendant improperly released stock to Spike.

As defendant points out, the shares were not the trust *res;* the contract of purchase was. The shares were only the collateral to ensure that Spike made the contractual payments. That does not mean, however, that defendant's duty with regard to the shares was less than it would have been if they had themselves been the trust *res.* Spike and Mary carefully established the conditions on which the seller (whose obligations defendant assumed after the transfer of the estate's assets to the trust) could release shares. They designed those conditions to give Mary security for what both knew would be her primary income, because the shares were the estate's primary asset. It was defendant's duty to ensure that the security for which Mary had bargained was not impaired. By releasing the shares in violation of the clear conditions of the contract, it violated that duty.[4] The court did not err in any way that defendants assert on appeal.

**2.** On their cross-appeal, plaintiffs argue that the

---

[4] It appears that defendant may not have received the full number of shares from the estate that it should have and that it made no attempt to determine where the missing shares were or to recover them. Because of the importance of the collateral to the security of the contract, such a failure would be as much a breach of defendant's duty as if defendant had failed to take possession of shares that were themselves part of the trust *res.* If defendant is correct in its assertion that Spike had received full control of some unpaid shares before the transfer of the estate's assets to defendant, that control was wrongful under the contract, and it was defendant's duty to regain control of those shares for the benefit of the trust.

court's measure of damages was incorrect. They argue that defendant breached its duty each time that it allowed Spike to receive shares for which he had not paid and that defendant should account for the money that the trust would have received if defendant had required full payment before releasing those shares. The releases of the shares, plaintiffs assert, changed the structure of the contract in a way that resulted both in the conversion of the contract into an unsecured loan to Spike of the unpaid amounts and in the depreciation of the investment value of the remaining balance of the contract. Either of those theories of damage, plaintiffs argue, would require a significantly higher award than the one that the trial court made.[5]

This case is unlike *Hatcher v. U.S. Nat'l Bank,* 56 Or App 643, 643 P2d 359, *rev den* 293 Or 373 (1982), on which plaintiffs rely. In *Hatcher,* the sale of the stock occurred after the establishment of the trust, there had been no default on the contract, and the breaches of duty for which the court awarded damages against the trustee all related to the way in which it structured the sale. In contrast, defendant here became the assignee of the contract when it was already in existence and had had nothing to do with its creation. Defendant's breaches of duty were the result of its unreasonable construction of the terms of the contract. We agree with the trial court that, in those circumstances, the proper measure of damages is the difference between the value, at the time of trial, of the collateral that would have been available at the time of the default if defendant had acted properly and the value of the collateral that was actually in defendant's possession at that time.[6] Because of the decline in the value of

---

[5] In their original complaint, plaintiffs sought damages on theories that were different from the theory that the court ultimately used and that were closer to the theories that they argue in their cross-appeal. However, they presented evidence that supported the court's theory and moved to amend their complaint to conform to that evidence when the court indicated that it was not persuaded on the other theories. Defendant, in one of its assignments of error, argues that the trial court abused its discretion in allowing that amendment. We disagree. The new theory related only to damages and did not require evidence beyond that already in the record.

[6] Plaintiffs also argue that they are entitled to interest on the amounts that defendant should have collected under the contract before releasing the shares to Spike. Because we agree with the trial court that defendant's breach was in releasing the shares, not in failing to collect the money, we also agree with its refusal to award interest. There was no money due at the times of the releases on which interest could have accrued.

BanOre shares, the trust would have received no more than the trial court awarded, even if defendant had fulfilled its duties.

**3.** Plaintiffs next argue that they brought this case under ORS 128.135 and that they are therefore entitled to attorney fees under ORS 128.155, which provides:

> "A beneficiary who petitions a court under ORS 128.135 * * * shall file with the petition an undertaking with one or more sureties to the effect that the beneficiary will pay all costs, disbursements and reasonable attorney fees that may be ordered against the beneficiary in the proceeding. If the beneficiary is unsuccessful in the proceeding and the court finds that the beneficiary filed the petition in bad faith, or that the petition was frivolous, the court may tax the costs and disbursements of the proceeding, including any appeal therein, and reasonable attorney fees against the unsuccessful beneficiary and the surety on the undertaking. If the beneficiary is successful, the court may tax the costs and disbursements of the proceeding, including any appeal therein, and reasonable attorney fees against the trust estate or the trustee individually."

In their complaint, plaintiffs sought the removal of defendant as trustee and an accounting of the trust, including damages for the premature release of the shares. They also filed an undertaking to pay any costs, disbursements and attorney fees that the court might award defendant under ORS 128.155.[7] Thus, they complied with the procedural requirements for bringing an action under ORS 128.135.

ORS 128.135(2) authorizes a beneficiary to seek, among other things, an accounting from a trustee and the appointment of a successor trustee. Plaintiffs in their complaint sought both. ORS 128.135(6) provides that the court "may approve or disapprove an accounting or any part thereof and may surcharge the trustee for losses, if any, caused by negligent or wilful breaches of trust." The judgment in this case awarded plaintiffs judgment "in the amount of $197,889.78 as a surcharge for losses caused by the negligent breach of trust by the Defendant The Bank of California * * *."

---

[7] Mary was the surety on the undertaking. Defendants did not object in the trial court or on appeal to a plaintiff also acting as the surety.

The trial court did not explain why it denied plaintiffs' request for attorney fees. It simply stated that "you're not entitled to a judgment against the bank for attorney fees." Although it is more helpful for our review for a court to state its reasons, in this case we can determine that the court did not exercise its discretion to deny fees but held as a matter of law that there was no authority for an award. That holding was incorrect. Plaintiffs sought relief under ORS 128.135 in their complaint, and they received it in the judgment. The only issue was the discretionary one of whether the trust or defendant should pay plaintiffs' attorney fees. The damages that plaintiffs recovered were the result of defendant's fault, and we find, on *de novo* review, that plaintiffs are entitled to an award of attorney fees from defendant under ORS 128.155. We remand for the entry of such an award. *See Windishar v. Windishar,* 83 Or App 162, 167-168, 731 P2d 445 (1986), *on reconsideration,* 84 Or App 580, 582-583, 735 P2d 10 (1987).

**4-6.** The final issue is the trial court's refusal to order defendant to repay the fees that it charged for managing the trust. We have held that defendant breached its trust by failing to collect all of the collateral and by delivering shares to Spike in violation of the unambiguous language of the contract. Denial of compensation as a sanction for a breach of trust is a discretionary determination for the court. Factors to consider include whether the breach was intentional, negligent or without fault; whether it relates to all or part of the trust; and whether the trustee's services have been of value to the trust. *Cloud v. U.S. National Bank,* 280 Or 83, 93, 570 P2d 350 (1977). In this case, the breach was negligent and related to the greatest portion of the trust. Rather than providing benefits to the trust, defendant dissipated most of the security for its major asset by acting on an unreasonable reading of the contract. We therefore exercise our discretion to deny defendant any compensation and order it to repay the compensation that it has received.

Affirmed on appeal; on cross-appeal, reversed and remanded with instructions to enter judgment for plaintiffs to recover defendant's trustee fees and for an award of attorney fees; otherwise affirmed.