INTERFIRST BANK DALLAS, N.A., et al., Appellants,

v.

Sara RISSER, et al., Appellees.

No. 9421.

Court of Appeals of Texas, Texarkana.

Aug. 19, 1987.

Rehearing Denied Nov. 10, 1987.

Michael Byrd, Akin, Gump, Strauss, Hauer & Feld, Dallas, David C. Turner, Bonham, for appellants.

Ben L. Krage, Dallas, Ed T. Smith, Bonham, for appellees.

GRANT, Justice.

InterFirst Bank Dallas, N.A., appeals an adverse judgment in a suit brought against it as trustee by the beneficiaries of two trusts. (We shall refer to InterFirst Bank as InterFirst or as the trustee and to the appellees as the beneficiaries.)

Dr. Joe Risser, Sr., a resident of Bonham, died in 1974. In his will, he set up two trusts named after his son and daughter—the Marien Louise Poston trust and the Joe A. Risser, Jr. trust. InterFirst was named substitute or successor trustee under the will, after the original trustee, R. Eugene Risser, Jr., who was Dr. Risser's brother. The primary beneficiaries of the trusts are the son and daughter for which the trusts were named and Dr. Risser's wife, Sara Risser. The children of the son and daughter (Dr. Risser's grandchildren) are the secondary beneficiaries. The trusts are to continue as long as either the son or daughter and Sara Risser live. The annual income of the trusts was to be distributed one-fifth to Sara Risser (from each trust) and the remainder to the son and daughter out of their respective trusts, with contingencies for secondary beneficiaries. The daughter, Marien Poston, died in 1976, leaving a young child, Joseph Benjamin Poston, who receives his mother's portion of the income from the trust as a secondary beneficiary. The appellees are Sara Risser, Joe R. Risser, Jr., Bennie W. Poston as guardian of Joseph Benjamin Poston, and the other grandchildren of Dr. Risser, being Robbi Jo Wray (by Carolyn Wray as next friend) and Rikki Amelia Wray.

Among the assets of Dr. Risser's estate which were to be divided evenly between the trusts were 968.5 shares of stock in Southwest Pump Company. (The 968.5 shares represented 32.28% of the 3,000 shares of Southwest Pump Company outstanding at that time.)

Southwest Pump Company was founded under a different name in 1929. It is a closely-held corporation which manufactures gasoline pumps and accessories. Evaluations of the company introduced at trial varied. The company has been a customer of InterFirst (or its predecessor, First National Bank) since at least 1940.

R. Eugene Risser, Jr., the original trustee, died in 1978, with little having been

done with his brother's estate. InterFirst refused to accept the appointment as trustee unless a final accounting of the estate was presented to and approved by a court. On August 15, 1980, the 6th District Court of Fannin County entered judgment approving a final accounting of Dr. Risser's estate. The value of the Southwest Pump Company stock was listed in the accounting at $185 per share. InterFirst then assumed the trusteeships.

On December 19, 1980, InterFirst committed the act complained of in this suit. It sold the 968.5 shares of Southwest Pump Company stock which it held as trustee back to Southwest Pump Company for a total cash price of $500,000 ($512.26 per share).

On August 3, 1984, Preston State Bank, as guardian of the estate of a minority shareholder in Southwest Pump, filed a derivative suit under Tex.Bus.Corp. Act Ann. art. 5.14 (Vernon 1980) against Sally Estes, the controlling shareholder in Southwest Pump Company; William C. Estes, her husband and chief executive officer of Southwest Pump Company; J.J. French, Jr., the Esteses' attorney; and William E. Landrum and Joe D. Nelson, employees of InterFirst and Southwest Pump Company. The plaintiff alleged a conspiracy between the defendants to injure Southwest Pump Company through the sale of the 968.5 shares of stock from InterFirst as trustee to Southwest Pump Company, and its resale from Southwest Pump Company to Sally Estes. On November 19, 1984, the trial court granted a motion made by the defendants to have the trust beneficiaries joined as necessary parties.

InterFirst filed a plea in intervention on November 27, 1984. It asked that the court enter a declaratory judgment finding, declaring and ordering that the December 19, 1980, sale of Southwest Pump stock was fair, just, reasonable and proper; that InterFirst had not wronged the trust beneficiaries in any respect; that a full and correct accounting had been made of InterFirst's trusteeship; and that InterFirst be

discharged of all liability to the trusts and be allowed to resign as trustee, and that a successor trustee be appointed. The trust beneficiaries filed an original petition in the suit on March 11, 1985, naming as defendants the same parties as those named defendants in the original suit, with the substitution of InterFirst for Southwest Pump Company. The beneficiaries alleged, among other things, breaches of InterFirst's fiduciary duties, negligence, conspiracy, fraud and bad faith. They also asked for an accounting and the removal of InterFirst as trustee.

On April 16, 1985, the trial court entered orders severing various claims from the suit, leaving only the claims of the trust beneficiaries against InterFirst and two of its employees. During the course of trial, the beneficiaries non suited their claims against the employees, leaving only their claim against InterFirst.

The beneficiaries' claim against InterFirst was for breach of a fiduciary duty, specifically for a violation of the duty of loyalty through self-dealing in the sale of the stock. The beneficiaries claimed that InterFirst was involved in a scheme with William and Sally Estes to help the Esteses get control of the block of stock that was eventually sold by InterFirst for the trusts. Southwest Pump Company resold the stock to Sally Estes. The beneficiaries claimed a loss to the trust because the stock was sold to Southwest Pump Company for less than the stock was worth. This claim was submitted to the jury. On May 24, 1985, the trial court entered judgment against InterFirst, finding that InterFirst had breached the fiduciary duties which it owed to the beneficiaries. The trial court awarded the beneficiaries $1,000,000 in actual damages for the benefit of the two trusts (the difference between the $1,500,000 value of the stock found by the jury and the $500,000 received by the trusts for the stock). The court also awarded damages in the amount of $265,479.46 based upon the amount of interest income which would have been earned by each trust on $500,000 from De-

cember 19, 1980, until judgment. In addition, InterFirst was removed as trustee, and the court further ordered that all trustee's fees be returned with interest from the date charged in the amount of $73,896.05. The trial court awarded the beneficiaries the $10,000,000 in punitive damages found by the jury.

InterFirst appeals contending that the trial court erred in that there was no evidence or insufficient evidence as to actual damages, exemplary damages, bad faith, and self-dealing; in that there was no evidence of attorney's fees or inconvenience which was included for the jury's consideration under exemplary damages; that the charge failed to submit causation or to include issues submitted by the defendant and contained improper definitions, submissions, and instructions; in that it incorrectly based the judgment on the answers to the special issues as submitted; in that it allowed excessive exemplary damages; and in that it admitted evidence which was not relevant to a breach of fiduciary duty.

In reviewing the no-evidence points hereafter discussed, we consider only the evidence tending to support the finding, viewing it in the light most favorable to the finding, giving effect to all reasonable inferences therefrom, and disregarding all contrary and conflicting evidence. *Glover v. Texas General Indemnity Co.*, 619 S.W. 2d 400 (Tex.1981). Insufficient evidence points require that we consider and weigh all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

## THE FIDUCIARY DUTY

■ The fundamental duties of a trustee include the use of the skill and prudence which an ordinary capable and careful person will use in the conduct of his own affairs, *Tucker v. Dougherty Roofing Company*, 137 S.W.2d 884 (Tex.Civ.App.– Dallas 1940, writ dism'd judgmt cor.), and loyalty to the beneficiaries of the trust.

*Slay v. Burnett Trust*, 143 Tex. 621, 187 S.W.2d 377 (1945).

■ Provisions in an instrument creating the trust can relieve the trustee of certain duties, restrictions, responsibilities, and liabilities imposed on him by statute. Tex. Rev.Civ.Stat.Ann. art. 7425b–22 (Texas Trust Act).[1] However, the language of a trust instrument cannot authorize self-dealing by a trustee, because that would be contrary to public policy. *Langford v. Shamburger*, 417 S.W.2d 438 (Tex.Civ. App.–Fort Worth 1967, writ ref'd n.r.e.). This limitation should include any situation in which a trustee used the position of trust to obtain an advantage by action inconsistent with the trustee's duties and detrimental to the trust. Neither can an exculpatory provision in the trust instrument be effective to relieve the trustee of liability for action taken in bad faith or for acting intentionally adverse or with reckless indifference to the interests of the beneficiary. Restatement (Second) of Trusts § 222 (1959).

The will of Joe A. Risser, Sr. which set up the testamentary trust, contains the following provision: "(f) The Trustee shall never be liable for any action or any failure to act hereunder in the absence of proof of bad faith."

Thus, liability of the trustee for breach of trust in the present case must be based upon self-dealing, bad faith, or intentionally adverse acts or reckless indifference toward the interest of the beneficiary.

## FAIR MARKET VALUE

■ The first seven points of error urged by InterFirst involve the evidence of fair market value and the submission of fair market value to the jury. A trustee's duties of loyalty and reasonable care dictate that the trustee, when undertaking to sell property of a trust, fully employ the trustee's care, skill and judgment toward

---

1. Throughout this opinion citation to statutes will be to the statutory provision in effect at the time of the transaction involved in this case.

The cited provision is now contained in Tex. Prop.Code Ann. § 113.059 (Vernon 1984).

obtaining a fair market value for such property.[2] Certainly a trustee cannot be held liable based upon the privileged view of hindsight; but rather, his actions must be judged in the light of the information available to him at the time of the transaction. If the sale is fairly made, in good faith, for an adequate price, and with the required degree of diligence and care, the trustee should not be held liable. In examining whether a trustee exercised the proper degree of diligence and care, it is necessary to look at the efforts made by the trustee to determine the value of the property which was sold, the methods used in offering the property for sale, and whether the sale was made without endeavoring to obtain better offers.

■ The trial court properly instructed the jury that fair market value meant "the price at which the stock would change hands between a willing seller, under no compulsion to sell, and a willing buyer, under no compulsion to buy, with both parties having reasonable knowledge of relevant facts." This instruction contained the required elements as set forth in *Crockett v. Smith,* 485 S.W.2d 321 (Tex.Civ.App.–Tyler 1972, writ ref'd n.r.e.). Stated another way, the test of market value of closed corporation stock, not listed on an exchange and having no public market, is what a willing purchaser would pay to a willing seller who was not acting under compulsion to sell. *Bowers Steel, Inc. v. De Brooke,* 557 S.W.2d 369 (Tex.Civ.App.–San Antonio 1977, no writ). Some Texas cases refer to this as market value instead of fair market value, but the basic elements are the same. *City of Pearland v. Alexander,* 483 S.W.2d 244 (Tex.1972);

*City of Austin v. Cannizzo,* 153 Tex. 324, 267 S.W.2d 808 (1954). As Judge Learned Hand said in *Rice v. Eisner,* 16 F.2d 358 (2d Cir.1926), *cert. denied,* 273 U.S. 764, 47 S.Ct. 477, 71 L.Ed. 880 (1927), "In the end value is no more than the opinions of those who have, and those who have not, when they coincide."

At the time when InterFirst sold the 968.5 shares, there had not been many previous sales of shares of Southwest Pump stock, and the highest prior sale had been for $162.50 per share.[3] The stock had been valued at $200 per share in Joe Risser, Sr.'s estate tax return. In 1977, thirty shares had been sold by the trust department of a bank in San Angelo for $150 per share. That same year the trust department of the First National Bank of Miami sold some shares of the stock for $150 per share. Lewis Donaghey, an expert witness called by the defense, valued the stock at a range from $350 to $450 per share. James Rodgers, a retired employee of Southwest Pump Company in charge of accounting, believed $200 a share to be an adequate price at the time of the sale. John Furst, an expert called by the defendant, set a range of values on the stock from $500 to $550. Sally Estes valued the stock at $500 per share. Southwest Pump Company had first offered $314,000 (with $150,000 down and the remainder to be paid over an eight-year period) for the 968.5 shares of stock, which came to $324.21 per share. Later, French (the attorney representing Southwest Pump Company in trying to purchase the stock as well as the Estes's personal attorney) wrote a letter on behalf of Southwest Pump Company offering $480,000 with terms. The actual sale of the 968.5

2. In the case of *Hatcher v. United States National Bank of Oregon,* 56 Or.App. 643, 643 P.2d 359 (Ct.App.1982), the court held that the trustee had a duty to evaluate stock held in trust and to obtain fair market value if the stock is sold.

3. Sales of Southwest Pump Company stock between 1954 and the time of the sale of the stock involved in this controversy are as follows:

| Date | Price |
|---|---|
| 7/29/54 | $128.00 per share |
| 10/12/56 | $120.00 per share |
| 7/17/72 | $150.00 per share |
| 6/25/74 | $150.00 per share |
| 1/28/76 | $150.00 per share |
| 7/25/77 | $150.00 per share |
| 1/23/78 | $162.50 per share |
| 1/30/78 | $150.00 per share |
| 3/20/78 | $150.00 per share |
| 6/11/79 | $150.00 per share |
| 10/30/79 | $162.50 per share |

shares was for $500,000, being $516.26 per share.[4] The shareholders' equity in the stock, or book value,[5] according to an exhibit prepared by InterFirst, was $1,022.20 per share at the end of 1979 and $1,408.51 per share at the end of 1980.[6] John Turner, the expert called by the beneficiaries, found the fair market value to bè $3,996.80 per share. The jury found the fair market value of the stock to be $1,548.79 per share. (The actual finding of the jury was that the fair market value of the 968.5 shares of stock was $1,500,000.)

■ Thus, the jury had a variety of testimony and evidence upon which to base its findings. The triers of fact are not required to accept the opinions of the experts on either side of the controversy, *Trinity River Authority v. McMurrey*, 439 S.W.2d 887 (Tex.Civ.App.–Beaumont 1969, no writ), but the jury can determine the value to be somewhere in the range between the high and low values offered in evidence. *Tenngasco Gas Gathering Co. v. Fischer*, 653 S.W.2d 469 (Tex.App.–Corpus Christi 1983, writ ref'd n.r.e.); *Centerville Ind. Sch. Dist. of Leon Co. v. Wingfield*, 450 S.W.2d 946 (Tex.Civ.App.–Waco 1970, no writ).

■ Citing *Roberts v. Harvey*, 663 S.W. 2d 525 (Tex.App.–El Paso 1983, no writ), InterFirst takes the position that the trial court erred in even submitting an issue on fair market value, because the stock had not been sold in sufficient quantities to establish a prevailing sales price. In the *Roberts* case, the appellee admitted that there was no evidence establishing a fair market value. The court held in *Roberts*

that, in the absence of testimony or evidence of a reasonable cash market value of the stock, the value should be determined by finding the difference between the value of the assets and the liabilities of the corporation. In the present case there is not an absence of expert testimony opining the fair market value, even though the small amount of Southwest Pump Company stock which had been sold was not considered as a factor by which the fair market value could be determined by any of the expert witnesses. We agree with the holding in the *Roberts* case that where there is no evidence of fair market value, an issue should not be submitted to the jury asking for the fair market value. However, in the face of the expert opinions on methods of evaluating stock in a closely held corporation, we do not agree that such a determination must be based upon prior sales of stock in the corporation.

■ Sales between family members are generally not relied upon in establishing fair market value. *Kinney's Estate v. Commissioner of Internal Revenue*, 80 F.2d 568 (9th Cir.1935). Neither is a sale involving corporate insiders such as officers, directors, or employees. *Wood v. United States*, 89 Ct.Cl. 442, 29 F.Supp. 853 (1939). Most of the previous sales of Southwest Pump Company stock were in these categories. Moreover, there were only a few scattered sales of smaller blocks. Accordingly, the expert witnesses properly sought other methods for arriving at a fair market value.[7]

InterFirst takes the position that stock in the Southwest Pump Company had no fair market value, because a specific potential

---

4. A part of the consideration was shares of stock in the Bonham State Bank which the trustee immediately sold to the Bonham State Bank. The proceeds of this sale along with the money received from Southwest Pump Company totalled $500,000.

5. Book value is entitled to little, if any, weight in determining the value of corporate stock, and many other factors must be taken into consideration. *Bendalin v. Delgado*, 406 S.W.2d 897 (Tex.1966).

6. The 1980 figure is based on profit and loss projections prepared by James Rodgers, Chief Financial Officer of Southwest Pump Company.

7. Landrum, an expert witness for InterFirst, testified that the sales of Southwest Pump Company stock had been infrequent, had consistently been in small blocks, and had been to buyers who were generally members of the Risser family.

buyer was not shown. Although the figure for fair market value is based upon a hypothetical buyer and a hypothetical seller, this concept assumes that both a purchaser and seller will be available in the marketplace. The language of the charge instructed the jury to find "the price at which the stock would change hands." If there were no potential purchasers, the fair market value would be non existent.

The case of *Ambassador Oil Corporation v. Robertson*, 384 S.W.2d 752 (Tex.Civ. App.–Austin 1964), *writ ref'd n.r.e. sub nom., Robertson v. Balckwell Zinc. Co.*, 390 S.W.2d 472 (Tex.1965), indicates that one sale was not sufficient to fix a fair market value. In the case of *Taylor County v. Olds*, 67 S.W.2d 1102, 1103 (Tex. Civ.App.–Eastland 1934, writ dism'd), the court said:

> There can be no "market value," accurately speaking, in the absence of a market; which is to say that there can be no market value of property at a given time and place if there have been no sales of any property of like kind and quality and in sufficient quantity to establish a prevailing sales price of such property.

In the case of *International & G.N.R. Co. v. Pape*, 73 Tex. 501, 11 S.W. 526 (1889), the Supreme Court said that "[w]hat an article will bring in the market, when no other article of a like character has been sold, is necessarily a matter of conjecture." The Court goes on to say that when there is no market price, some other method must be resorted to for establishing its value. In both of the foregoing cases, the courts referred to "like character" or "like kind." Thus, the Court is not ruling out comparables, which is the basis used by the beneficiaries' expert witness in this case.

In the case of *City of Dallas v. Anderson*, 570 S.W.2d 62 (Tex.Civ.App.– Dallas 1978, writ ref'd n.r.e.), the court said:

> The better view is, of course, to permit a witness wide latitude in offering comparable sales which are the basis for his opinion of the value of the subject property. This is true because use of these "comparable" sales gives the jury a valuable measure of the competence of the witness' opinion.... In our view, if the sale is a free and open market sale, it should be admitted into evidence except in that extraordinary instance where it is clearly evident to the judge that the admission of the sale is likely to lead to an erroneous jury verdict.

A challenge to the expert witness was made in the case of *Foley Brothers Dry Goods Co. v. Settegast*, 133 S.W.2d 228 (Tex.Civ.App.–Galveston 1939, writ ref'd), because he testified as to a hypothetical buyer and seller, and the court upheld the validity of the testimony.

▪ The trust department of InterFirst denied the beneficiaries the opportunity of obtaining a purchaser at a higher price by failing to seek higher offers, by failing to notify the beneficiaries that the stock would be sold, and by failing to get an outside appraisal. No reasonable view can allow the trustee to now tell the beneficiaries that they cannot show their loss unless they go back in time and find an actual entity who was ready to purchase the stock at a higher price on that date. Furthermore, in addition to the comparable sales offered by the beneficiaries' expert witness, there was testimony that a market existed for minority blocks of stock in closely held corporations.

▪ A trustee's duty of loyalty and reasonable care dictates that it must seek the best price obtainable for trust property which it is selling. Furthermore, the trustee should secure competitive bidding and surround the sale with such other factors as will tend to cause the property to sell to the greatest advantage. *See* G.G. Bogert & G.T. Bogert, *The Law of Trusts and Trustees* § 749 (2d ed. 1982).

All of the expert witnesses except one recognized Revenue Ruling 59–60 as authoritative in evaluating closely held corpo-

rations.[8] The expert witnesses did not agree however, as to how Revenue Ruling 59–60 would apply to the evaluation of the shares of Southwest Pump Company in the present case. Revenue Ruling 59–60 was issued as guidance for ascertaining the value of stock for tax purposes; however, the expert witnesses indicated that the ruling's approach would also be valid for finding the fair market value for other purposes as well. (We have cited some tax cases herein interpreting and applying Revenue Ruling 59–60, because of its general applicability.) Section 4 of the ruling sets forth eight relevant factors which should be considered as fundamental, but not all inclusive, for the evaluation of stock in closely held corporations or for stock of corporations for which the market quotations are either lacking or too scarce to be recognized:

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend paying capacity.

(f) Whether or not the enterprise has good will or other intangible values.

(g) Sales of stock and the size of the block of the stock to be valued.

(h) The market price of stocks of corporations engaged in the same or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

William E. Landrum, Jr., head of the business interests department within the InterFirst trust department, testified that the Southwest Pump Company stock made up 39% of the assets of the trusts. He came to the conclusion that this stock should be sold so that the trust could invest in something which was more reliable and which would produce more annual income. He also was of the opinion that Southwest Pump Company was the only potential buyer for the stock, and he based his evaluation on that opinion. When Landrum endeavored to calculate the value of the stock, he took five average annual earnings from five years (1976 through the projected income for 1980). He arrived at average earnings of $166, and he multiplied that times five. (He testified that a closely held company's stock usually sells at multiples of earnings in the range of five to ten times annual earnings.) He reached a figure of $830 per share, but he then discounted it 25% for its lack of marketability. Using this method he found the price to be $623 per share. He also calculated the value of the stock by attaching a weighted average[9] to the more recent annual earnings for the five-year period, arriving at an average of $210. He then multiplied this by four and discounted the figure by 25% to reach a price of $630 per share. Landrum testified that he took the low end of the scale for the multiple figure and discounted the stock 25%, because he believed the business endeavors of Southwest Pump Company to be risky. This was based upon the fact that a large percentage of Southwest Pump's product was being sold to one customer, Gulf Oil Company. Furthermore, he was concerned about the transitional period which the company was facing in converting to electronic equipment. While he was aware that the company's business and earnings had dramatically increased, he believed this to be a short-lived

---

8. The one witness who was an exception indicated he was only vaguely familiar with that revenue ruling.

9. In the case of *Central Trust Co. v. U.S.,* 158 Ct.Cl. 504, 305 F.2d 393, 424 (1962), the court took a favorable earnings trend into account by weighing the earnings from the most recent years to a remote period. This is also recommended in Rev.Rul. 59–60 § 4.02(d), 1959–1 C.B. 237, which states, "If, for instance, a record of progressively increasing or decreasing net income is found, then greater weight may be accorded the most recent years' profits in estimating earning power."

phenomenon resulting from the entire industry being required to replace all gasoline pumps to accommodate higher gasoline prices, which for the first time exceeded one dollar per gallon. Landrum testified that the stock price reached by his formula would have allowed a five-year payout, and he further reduced that price for cash to $516.26, for which the stock was sold.

Landrum did not obtain an outside appraisal. He did not inform the beneficiaries that he was selling the stock. He did not test the water by trying to see what offers he could get from other potential buyers. He did not make a formal presentation to the appropriate bank committee, but rather circulated a memorandum to a majority of that committee on the day before Christmas. This committee's approval appears to have occurred after the transaction. Landrum explains that the urgency in getting the matter closed was because he was receiving stock in the Bonham State Bank as a part of the purchase price, and he had an agreement with the Bonham State Bank which provided that the Bonham bank would purchase this stock if it was done before the first of the year. Landrum never had the Southwest Pump Company stock changed to reflect InterFirst as the legal owner. Landrum indicated that he did not try to sell the stock to any of Southwest Pump Company's customers or competitors, because he did not believe that they would be interested in purchasing a minority interest in a closely held corporation and approaching them might cause InterFirst to lose Southwest Pump Company as a potential purchaser.

John Turner, who testified as an expert witness for the beneficiaries, used the Tokheim Corporation as a comparable. Turner testified that he began with thirty or forty companies and narrowed it down to a close examination of four companies. Of that four, Tokheim was the only one which he found to be a comparable. The other companies were determined not to be a comparable of Southwest Pump Company, because of their degree of diversification into areas other than pump manufacturing. Tokheim received 87.4% of its revenues from gasoline pumps. He also testified to other comparisons, which included the volume of sales for each company (which had significantly increased over the five-year period for both companies), the shareholders' equity or book value, the ratio of the current assets to the total assets, the ratio of the fixed assets to the total assets, the ratio of the current liabilities to the total assets, the ratio of net worth to the total assets, the ratio of the total liabilities to the net worth, the ratio of the working capital to the total assets, and the ratio of the current liabilities to the current assets. From these comparisons, he concluded that Tokheim would be an appropriate company to use as a comparable, and since its stock was an over-the-counter stock, he was able to obtain the value which Tokheim was trading for at the close of the business day [10] on which the Southwest Pump Company stock was sold.

Turner first took the same $1,408 per share net worth figure which had been used by Landrum in his memorandum for Southwest Pump Company. He multiplied that figure by 2.4, which was the ratio of Tokheim's price per share to its net worth per share. He then took the earnings per share of Southwest Pump Company and multiplied it by 11.4, which was the ratio of Tokheim's price per share to annual earnings.[11] (At this point Turner erred by us-

**10.** In the case of *Hall v. Commissioner,* 34 T.C. M. 648 (1975), the court rejected the use of a single selling price established on the day of valuation for comparison with the average earnings over a five-year period. The court preferred that the expert establish yearly price-earnings ratios for each comparable corporation by dividing the corporation's yearly earn- ings by the *average* price of the corporation's stock during that year.

**11.** Three other companies in the business of manufacturing gasoline pumps were Goulds Pumps, the stock of which was selling for 38.6 times earnings, and Duriron, the stock of which was selling for 17 times earnings, and Valtek,

ing the figure of $388 as earnings for Southwest Pump Company. The 1980 earnings after taxes were $811,422.87. Southwest Pump Company divided those earnings by 2,031.5 shares, which was the number of shares outstanding in that company after the purchase of the 968.5 shares involved in this case, and reported a figure of $399.42 per share. Prior to this sale when the purchase was being contemplated, the corporation had 3,000 shares of outstanding stock, and thus the 1980 earnings based upon the outstanding shares at the time of the sale was $811,422.87 divided by 3,000, being $270.47 per share.) Next Turner determined that the dividend capacity of Southwest Pump Company was $97 per share, and that Tokheim was paying dividends equivalent to 2% of the price per share. He then calculated the price of the stock required to generate $97 per share at a rate of 2% of cost. Turner then weighted the values found by giving the net worth figure a 45% value, by giving the net earnings [12] figure a 45% value, and by giving the dividend capacity figure a 10% value. Thus, he arrived at a fair market value per share of $3,996.08.[13] He testified that Tokheim was approximately ten times the size of Southwest Pump Company based upon working capital, and five times the size of

Southwest Pump Company based upon sales revenues. He opined that it was still a comparable, although he would not exceed the ten-times ratio in seeking a comparable.

One of the areas of dispute was the effect of the size of the block of stock sold by InterFirst as a trustee.[14] Turner took the position that it should not be treated as a minority interest because it was the swing block and without it no one would have a majority interest.[15] However, no evidence was presented to show that the bank had reason to believe that the management (the Esteses) did not have for all practical purposes a majority interest, because members of the family had for a long time given management their proxies to vote as they wished. One witness characterized the Risser family control of the company by saying, "All of 'em were riding in the same buggy." The Esteses later purchased the 968.5 shares of stock from the corporation, but even before that purchase, the Esteses gained a majority interest when the corporation purchased the stock. Turner did not add a premium to the stock as a controlling block as the court did in *Heiner v. Crosby*, 24 F.2d 191 (3d Cir.1928), but neither did he discount the stock as a minority block.

the stock of which was selling for 37 times earnings.

**12.** The earnings must be considered as an important factor in this type of business. As the court said in *Borg v. International Silver Co.*, 11 F.2d 147 (2d Cir.1925), "Every one knows that the value of shares in a commercial or manufacturing company depends chiefly on what it will earn."

**13.** One of the expert witnesses for InterFirst testified that the formula approach was no longer deemed proper, thus criticizing Turner.

In the case of *Estate of Obering v. Commissioner*, 48 T.C.M. 733 (1984), an examination by the expert of every factor listed in Revenue Ruling 59–60 was given little weight because he did not quantify any of the factors and did not explain the relative weight he assigned to each in reaching his determination. The court said that the assessment of the individual factors alone, without an attempt to bridge the findings to some quantifiable standard rendered the estimates unsupportable. While Section 7 of Revenue Ruling 59–60 negates a prescribed formula

for the averaging of several factors, Section 5 recommends that the appraiser give more weight to some factors than to others depending upon the nature of the company's business.

**14.** Rev.Rul. 59–60 § 4.02(g), 1959–1 C.B. 237, states:

The size of the block of stock itself is a relevant factor to be considered. Although it is true that a minority interest in an unlisted corporation's stock is more difficult to sell than a similar block of listed stock, it is equally true that control of a corporation, either actual or in effect, representing as it does an added element of value, may justify a higher value for a specific block of stock.

**15.** Prior to the sale, the stock ownership of the twenty-three shareholders of Southwest Pump Company was as follows: Bill Estes and Sally Risser Estes, 37.82%; Joe A. Risser, Jr. Trust, 16.14%; Marien Louise Poston Trust, 16.14%; Irene Risser Miller, 14.10%; company officers, 1.17%; all others, 14.63%.

A sale by a trustee at a price which is slightly less than the fair market value is not alone enough to create liability. The matter of liability is discussed later in the opinion. However, once the factfinders have made a determination of the fair market value of the stock and the sale price is undisputed, as it is in this case, the amount of loss to the beneficiaries is obvious. When trust property is sold for an inadequate price, the only way to calculate what price was obtainable is on the basis of fair market value. Thus, the fair market value at the time of the sale is an ultimate fact issue. As stated in the Restatement (Second) of Trusts § 205 (1959), "If the trustee commits a breach of trust, he is chargeable with any loss ... in value of the trust estate resulting from the breach of the trust." The restatement illustrates this rule with the following example:

> (d) *Sale for less than value.* If the trustee is authorized to sell trust property, but in breach of trust he sells it for less than he should receive, he is liable for the value of the property at the time of the sale less the amount which he received.

The foregoing approach was used by the trial court to determine the amount of damages. If the trustee is guilty of a breach of trust in selling trust property for an inadequate price, he is liable for the difference between the amount he should have received and the amount which he did receive. III Scott, *Law of Trusts* § 208.6 (3d ed. 1967). We find that there was ample evidence to allow the jury to determine the fair market value of the stock, and we overrule the points of error related to fair market value.

## BUSINESS ASSOCIATE

The beneficiaries made an effort to bring the trustee under the self-dealing provision of the Texas Trust Act by the submission of Special Issue No. 3:

> Do you find from a preponderance of the evidence that at the time InterFirst

Bank Dallas, N.A., sold the 968.5 shares of stock to Southwest Pump Company, Inc. that the Pump Company was a "business associate" of the bank?

The term "business associate" was defined for the jury as follows:

> "Business Associate" as used herein means more than association in business. A business association of a person, corporation, or other entity is an associate whose interest or interests are so intertwined that the goals of a particular business venture are the same.

The applicable portion of Tex.Rev.Civ. Stat.Ann. art. 7425b–12 [16] was as follows:

> A trustee shall not buy or sell, either directly or indirectly, any property owned by or belonging to the trust estate, from or to itself or an affiliate; or from or to a director, officer or employee of such trustee, or of *an affiliate;* or from or to himself, a relative, employer, partner *or other business associate;* ... (emphasis added).

InterFirst contends that the last series of terms (in Section 12 above), including the term "business associate," are relationships which could be applied to an *individual* trustee as opposed to the preceding series of terms which would be applicable to a *corporate* trustee. Thus, they contend, the trial court should have used the term "affiliate" and the definition provided in the statute. We do not find such a distinction readily apparent. For example, an "employee" could mean an employee of an individual or corporation, whereas the terms "director" or "officer" could apply to a corporation, but not to an individual. On the other side of the disjunctive, it is true that a corporation cannot have a relative or an employer, but a corporation could enter into a partnership arrangement.

The application of this section is best addressed under the rule of statutory construction "ejusdem generis." The rule is designed to aid in the interpretation of general words which follow specific

**16.** Now found in Tex.Prop.Code Ann. § 113.053(a) (Vernon 1984).

words in a statute by construing the general term to embrace things similar in nature. *Goldring v. Goldring*, 523 S.W.2d 749 (Tex.Civ.App.–Fort Worth 1975, writ ref'd n.r.e.). The term "business associate" would include a relationship which is generally confidential in nature, and as the trial court's definition provided, it should be more than just a party with whom a contract is made and more than just a relationship of a business to a customer. An example of a business associate includable under the act is a joint venturer.

There was no evidence to establish this type of relationship between InterFirst and Southwest Pump Company. While it is true that they had a mutual interest in that Southwest Pump Company wanted to prosper as a business, and InterFirst wanted to see Southwest Pump Company prosper so that it could repay its loan, this is not the type of relationship intended by the statute. All contractual relations involve some matter of mutual interest, but mere contractual relations do not make the contracting parties business associates.

The Trust Act not only prohibits sales to or from the trustee but also prohibits sales to an affiliate, director, officer, employee, relative, employer, partner or other business associate of the trustee. Tex.Rev.Civ. Stat.Ann. art. 7425b–12. The terms "affiliate" and "relative" are defined in Tex.Rev. Civ.Stat.Ann. art. 7425b–4,[17] but the term "business associate" is not defined. Furthermore, we find no Texas case defining "business associate" in the context of the Trust Act. We do not find error with the definition of a business associate given by the court.

The definition given by the court to the jury instructed them that the term "business associate" means more than an association in business. The beneficiaries point to the following evidence to establish that the bank was a business associate: (1) The bank and the Southwest Pump Company had enjoyed an excellent business relationship for over forty years; (2) the bank maintained an interest in the Southwest Pump Company's success; (3) the bank served as trustee for the Southwest Pump Company's deferred compensation plan; (4) the bank furnished the Southwest Pump Company a line of credit which had been increased to $3,000,000 in 1980, and the bank further agreed to lend an additional $3,000,000 for the building of a new plant; (5) there were personal relationships existing between the bank's employees and Southwest Pump Company's management; (6) the president of the bank spoke at the opening of the Southwest Pump Company's new plant; and (7) the Southwest Pump Company management had entertained bank officers.

In analyzing these interrelationships individually and collectively, we find that they constitute no more than regular business practices between a business entity and a customer. They do not provide evidence that would show more than an association in business. These are matters consistent with general practices of a banking institution.

The beneficiaries offer one other item as proof that Southwest Pump Company was an associate of the bank: Bill Landrum, an employee of the bank's trust department, was aware that the stock sale would give the existing Southwest Pump Company management absolute voting control over the company, which would insure that the company would have proper management and thus would be able to repay its loans to the bank. While the evidence does show that the trust department realized that this would give Sally Estes a majority interest in the company, this does not make Southwest Pump Company a business associate of the bank.

We conclude that the evidence does not establish that Southwest Pump Company was a "business associate" as that term is used in the Trust Act.

## BAD FAITH AND SELF–DEALING

InterFirst complains that the trial court erred in rendering judgment against Inter-

**17.** Now contained in Tex.Prop.Code Ann. § 111.004 (Vernon 1984).

First because there was no evidence or insufficient evidence to support the jury's finding of bad faith, and because the jury was improperly instructed on the issue of bad faith. InterFirst also contends that the trial court erred in rendering judgment that InterFirst violated its fiduciary duties because there was no evidence or insufficient evidence to support the finding of self-dealing; because the issue on self-dealing was ambiguously worded; because the jury was improperly instructed on the definition of self-dealing; and because InterFirst was not engaged in self-dealing as a matter of law. We shall discuss the issues on bad faith and self-dealing together.

■■■ In reviewing errors involving the submission of special issues to the jury, the submission must be considered as a whole in determining whether the error was prejudicial. *Pan-Am Foods, Inc. v. Perez*, 386 S.W.2d 316 (Tex.Civ.App.–Corpus Christi 1964, writ ref'd n.r.e.). The burden is on the appellant to show the probability of harm when the entire record is considered. *American Petrofina Company of Texas v. Ray*, 383 S.W.2d 616 (Tex.Civ.App.–Eastland 1964, writ ref'd n.r.e.).

The term "bad faith" was defined for the jury in the charge to mean "acting knowingly or intentionally adverse to the interest of the trust beneficiaries or with reckless indifference to the interests of the beneficiaries."

Black's Law Dictionary defines the term "bad faith" as:

> The opposite of "good faith," [18] generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

■■■ It has been held that a finding of bad faith requires some showing of an improper motive, *King v. Swanson*, 291 S.W.2d 773, 775 (Tex.Civ.App.–Eastland 1956, no writ), and that improper motive is an essential element of bad faith. *Ford v. Aetna Insurance Company*, 394 S.W.2d 693 (Tex.Civ.App.–Corpus Christi 1965, writ ref'd n.r.e.).

We also find that the court improperly defined "bad faith" to include "reckless indifference to the interests of the beneficiaries." However, as pointed out in the Restatement (Second) of Trusts, § 222 (1959):

> (1) Except as stated in Subsections (2) and (3), the trustee, by provisions in the terms of the trust, can be relieved of liability for breach of trust.
>
> (2) A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed in *bad faith* or intentionally *or with reckless indifference* to the interest of the beneficiary. (Emphasis added)

We point out that the disjunctive "or" shows that "reckless indifference" is not contained within the meaning "bad faith." Nevertheless, "reckless indifference" constitutes conduct that cannot be relieved by provisions in the trust instrument. Thus, this instruction would have been appropriate for a finding in addition to bad faith, and therefore it is not reversible error to have it contained within the definition of bad faith. In other words, the issue could have asked the jury to find whether InterFirst acted in bad faith or with reckless indifference in selling the stock, and the result would have been the same. Either way included conduct which could not be relieved by the trust instrument.

■■■ We further agree with InterFirst that the definition of bad faith should have contained a reference to improper motive, but the absence of this element is supplied in Special Issue No. 2, which inquires whether the bank was engaged in "self-

---

**18.** The only statutory definition of good faith is contained in Tex.Bus. & Com.Code Ann. § 1.201(19) (Vernon 1968), and defines "good faith" to mean "honesty in fact in the conduct or transaction concerned."

dealing." Certainly a finding of self-dealing as defined in the charge establishes an improper motive. Looking at the jury charge as a whole, we do not find that the manner of the submission of the issue on bad faith constitutes reversible error.

Tex.Rev.Civ.Stat.Ann. art. 7425b–12 (Texas Trust Act)[19] prohibits a trustee buying from or selling trust assets to itself, from lending trust funds to itself, and a corporate trustee from buying its own stock for the trust.[20] These provisions also prohibit such dealing by entities closely related to the trustee.

However, the statutory prohibition does not exhaust the possibilities of conflicts of interest by a trustee. Any type of activity by the trustee which gives the trustee an advantage to the detriment of the beneficiaries could be construed as self-dealing. This would not include the trustee's right to reasonable compensation, nor should it include an activity not prohibited by statute in which the trustee does not use his position as trustee to gain such an advantage.

The earlier Texas trust cases involving breaches of fiduciary duty did not use the term *self-dealing;* nor did the cases make a clear distinction between self-interest, which was a statutory violation, as opposed to a conflict of interest situation. For example, the acts involved in *Slay v. Burnett Trust, supra,* seem to involve both a statutory violation and a conflict of interest, but the court did not draw any distinction between the two activities.

Perhaps it would be simpler if all Texas cases divided themselves into a neat dichotomy of those which involve statutory self-dealing and those which involve conflicts of interest not covered by the statute. However, such a clear division of terms does not exist in the case law. It has been suggested that it would be helpful to the courts to determine what is self-dealing and what is a conflict of interest but not self-dealing, so that the courts could then assess whether the danger of permitting the trustee to engage in the action must be so great as to make the action wholly impermissible or only such as to make the action permissible if justifiable. J. Dukeminier & S. Johanson, *Wills, Trusts, and Estates,* 870 (3d ed. 1984). Even in cases involving statutory self-dealing, Texas courts have not always said that such action was impermissible. *Humane Society of Austin and Travis County v. Austin National Bank,* 531 S.W.2d 574 (Tex.1975). In the *Humane Society* case, the trustee violated the prohibition against lending trust funds to itself (done in the form of certificates of deposit), but the court found that it was not in furtherance of its own self-interest to the detriment of the estate. Thus in a broad sense, self-dealing and the duty of loyalty are entwined to require the trustee to forego his own personal interest and opportunities for gain with respect to property subject to the fiduciary relationship and to act completely in the interest of the beneficiaries of the relationship. *Kinney v. Shugart,* 234 S.W.2d 451 (Tex.Civ. App.–Eastland 1950, writ ref'd). Historically, one of the reasons to separate self-dealing (in the narrow sense of a trustee buying trust property or selling his own property to the trust) from other types of conflicts of interest was that self-dealing required strict liability. Once it had been established that there was self-dealing, the no-further-inquiry rule came into play. This rule essentially said that good faith and fairness were not enough to save the trustee from liability if the trustee had engaged in self-dealing. For example, in the case of *Harvey v. Casebeer,* 531 S.W.2d 206 (Tex.Civ.App.–Tyler 1975, no writ), the court held that when there is a self-dealing transaction that is forbidden by statute, the beneficiary can attack it even though he has suffered no damage and the trustee has acted in good faith.

19. Now contained in Tex.Prop.Code Ann. § 113.053 (Vernon 1984).

20. Even these types of transactions can be approved by a court under proper circumstances.

*Price v. Johnston,* 638 S.W.2d 1 (Tex.App.–Corpus Christi 1982, no writ); Tex.Rev.Civ.Stat. Ann. art. 7425b–24(e) (now allowed by Tex. Prop.Code Ann. § 115.001 (Vernon 1984)).

In the present case, there was no statutory self-dealing. But there are many situations outside the statutory prohibition which may be deemed to be self-dealing if the trustee actually takes advantage of his position as trustee to the detriment of the trust.

■ The duty of fidelity required of a trustee forbids the trustee from placing itself in a situation where there is or could be a conflict between its self-interest and its duty to the beneficiaries. *Slay v. Burnett Trust, supra.* It is incompatible for a trustee to connect his own interest with his dealings as a trustee for another. The rule is founded on the danger of imposition of the trustee's personal interest and the presumption of the existence of fraud inaccessible to the eye of the court. *Nabours v. McCord,* 97 Tex. 526, 80 S.W. 595 (1904). A trustee may not use his position to obtain any advantage that is inconsistent with his primary duty to the beneficiaries. *MacDonald v. Follett,* 142 Tex. 616, 180 S.W.2d 334 (1944).

■ The jury was submitted the following issue and definition involving self-dealing:

SPECIAL ISSUE NO. 2

Do you find from a preponderance of the evidence that at the time InterFirst Bank Dallas, N.A., sold the 968.5 shares of stock to Southwest Pump Company, Inc., the bank was engaged in "self-dealing" as that term is defined herein?

Answer: "The bank was engaged in self-dealing"

OR

"The bank was not engaged in self-dealing."

. . . .

"Self-dealing" as used herein means the Trustee used the advantage of its position to gain any benefit for the Trustee, other than reasonable compensation, or any benefit for any third person, firm, corporation, or entity, at the expense of the Trust and its beneficiaries.

Although the definition of self-dealing is broader than the conduct prohibited by statute, as previously discussed, any conduct by the trustee which violates fiduciary duty by taking advantage of the trustee's position as trustee to benefit the trustee or some third person which the trustee desires to be benefited, can constitute self-dealing. The trustee holds a duty of loyalty to the beneficiaries to administer the affairs of the trust in the interest of the beneficiaries alone, and to exclude from consideration its own advantage as well as the welfare of third persons. G.G. Bogert & G.T. Bogert, *Law of Trusts* § 95 (5th ed. 1973). Black's Law Dictionary defines self-dealing in much broader terms than the prohibitions contained in the Texas Trust Act:

Basically relates to transactions wherein a trustee, acting for himself and also as "trustee," a relation which demands strict fidelity to others, seeks to consummate a deal wherein self-interest is opposed to duty.

Thus, we find the trial court did not err in the submission of the definition of self-dealing contained in the charge.

InterFirst complains that the trial court erred in admitting evidence of matters not relevant to the proceeding and in refusing their requested jury instructions. InterFirst points to no specific evidence which it contends was inadmissible. A number of its requested instructions to the jury concerned the trustee's duty to sell unproductive assets and its responsibility as to investments. Inasmuch as the trustee's right and duty to sell and its duty to properly invest were uncontested, then such instructions were unnecessary. Other requested instructions dealt with fair market value and offer shades of the same definition that was contained in the court's charge to the jury. We have reviewed the entire charge, and except for matters which we have previously pointed out, we find the charge to contain proper instructions to the jury.

InterFirst argues that the ambiguous wording of the self-dealing issue allowed the jury to answer affirmatively based upon self-dealing that was in no way related to the trusts in this case or the sale of the Southwest Pump Company stock. Although the issue could be read as asking for such a finding, such an interpretation is not likely. The jury was limited by the charge to matters based upon the evidence admitted during the trial. Since there was no evidence of any other self-dealing by the bank, we do not find the wording of the issue was calculated to mislead or confuse the jury. *Hidalgo County Water Control and Improvement Dist. No. 1 v. Peter,* 37 S.W.2d 133 (Tex.Comm'n App.1931, opinion adopted).

The mere fact that InterFirst lent money to Southwest Pump Company did not constitute self-dealing or bad faith, although it does create a potential conflict situation. When a person is setting up a trust and wishes a corporate trustee, it is very likely that that person will choose a lending institution with which he or she does business individually or through a closely held corporation. Furthermore, if a trust department were prohibited from selling stock to customers of the bank, many potential customers might be eliminated to the detriment of the trust. InterFirst and its predecessor, First National Bank, had done business with Southwest Pump Company for several decades prior to the transaction involved in this case. The opportunity to make the loan to Southwest Pump Company did not arise from the trust relationship. Such a relationship had existed for more than forty years and was in existence at the date of the testator's will and at his death. While a trustee may not take a position where self-interest might induce him to relax the obligations he owes to the beneficiaries or that would pit its own advantage against their welfare, the sale of stock, standing alone, to a bank customer did not involve self-dealing nor did it involve a breach of trust.

The beneficiaries take the position that they were not asserting that the bank was prohibited from lending money to Southwest Pump Company because of the stock it held as trustee, but that the bank allowed the loan relationship to become a detriment to the trust. They argue further that the bank had an affirmative duty to disclose any such loan relationship to the beneficiaries. Failure to disclose can be considered as a breach of fiduciary duty in some circumstances. *Russell v. Truitt,* 554 S.W.2d 948 (Tex.Civ.App.–Fort Worth 1977, writ ref'd n.r.e.).

One of the factors complained about by the beneficiaries relating to the loan relationship was a restrictive covenant in the loan agreement limiting the dividends allowed to be paid to the stockholders to a total of $10,000.[21] One of the basic duties of a trustee is to make the assets of the trust productive while at the same time preserving the assets. *McMullen v. Sims,* 37 S.W.2d 141 (Tex.Comm'n App.1931, holding approved). Based upon the past history of the payment of dividends to Southwest Pump Company stockholders, the trustee was justified in its decision to sell the stock, and the beneficiaries do not attack the decision of the trustee to sell the stock. While a restriction on the payment of dividends might have deprived the beneficiaries who were entitled to a life estate of some income, it could also enable the corporation to repay the loan and thus avoid foreclosure on assets. A trustee is often placed in the position of having to balance the equities between the beneficiaries entitled to a life estate and those entitled to a remainder interest. *San Antonio Loan & Trust Co. v. Hamilton,* 155 Tex. 52, 283 S.W.2d 19 (1955). Although Southwest Pump Company made its application to the Bonham Industrial Development Authority for the issuance of bonds to finance the acquisition and construction of a new pump facility in 1980, the record indicates the funding did not begin until

---

**21.** Prior to InterFirst's lending money through the bond program, the Bonham State Bank had

a restriction on dividends of $30,000 annually.

1981. This was after the stock had been sold by InterFirst, and InterFirst argues that the restriction on stock dividends could not take effect until after the loan was funded. We do not find sufficient evidence to show that such a restriction was part of a plot or conspiracy to force the sale of the stock. The testimony indicates that such restrictions are not unusual when large loans are made to a corporation.

The bank, as trustee, could not be permitted to use its position to obtain any advantage or profit inconsistent with its duty to the beneficiaries. *Kinney v. Shugart, supra.* Certainly, if it is not bad faith for the bank to lend money to the corporation, then the bank would be allowed such reasonable conduct as may be inherent in that relationship. For example, if the debt had not been paid when due, the bank would not be violating its fiduciary duties by foreclosing on secured properties under the terms of the lending agreement.

The beneficiaries also contend that the contacts and the significant and substantial dealings by the bank with officers of the Southwest Pump Company, and especially with William Estes and Sally Estes, show bad faith. Although the record indicates correspondence, direct contact, InterFirst employees dining with the Esteses on two or three occasions, pecans given to some of InterFirst's employees one Christmas by Southwest Pump Company, a duck stamp print given to William Estes by InterFirst, and the attendance by some of the bank officers at a dove hunt sponsored annually by Southwest Pump Company, such customary business courtesies do not constitute improprieties. This conduct is consistent with dealings with customers,[22] and for the trust department it is also consistent with the duties of a trustee to encourage the corporate enterprise and to obtain information and stay informed of the activi-

ties of the corporation. In this regard, the beneficiaries sought to use the dealings to show a conspiracy on one hand, but on the other hand, when there was a lack of contact, to show a neglect by the bank of its fiduciary duty to be informed about the asset.

Next, the beneficiaries contend that the showing of avarice on the part of the bank was sufficient to show bad faith. There is much discussion in the record about Sally Estes's efforts to acquire the majority of the stock in Southwest Pump Company, which had been started by her grandfather. Prior to his death, her father, Gene Risser, had also expressed an interest in purchasing the stock of his brother, but he was serving as executor for his brother's estate (Dr. Joe Risser), and realized that he could not make the purchase in that capacity.[23] He mentioned this matter to the bank, but the bank correctly informed him that such a transaction would require that he pay the fair market value. The fact that Sally Estes also wished to purchase additional stock in the corporation does not show bad faith on the part of InterFirst.

The loan restrictions placed on Southwest Pump Company by InterFirst also included a provision which prohibited the corporation from purchasing its own stock if the amount to be paid for the stock was over $10,000. Again, there was no showing that the bank took advantage of its position as trustee because there was no evidence of a refusal by the bank to allow the corporation to buy the stock. As to the complaint that the bank lent the corporation the money to purchase the stock, the record indicates that Southwest Pump Company got the money from its account and later replenished the account with a draw on a line of credit which had already been established with the bank. The beneficiaries contend that this demonstrated the

---

**22.** The bank had acted as a depositor and a major lender, and also was trustee of the company's deferred compensation program.

**23.** There would be no prohibition against Gene Risser purchasing the stock at a time when he was no longer in a fiduciary capacity as long as he did not use confidential information obtained in his fiduciary role and as long as he paid the fair market price.

bank's desire to make a profit by charging interest on this loan. However, if this had been the bank's motive, then the more Southwest Pump Company paid for the stock, the more interest the bank would receive. We find no acts under the loan restrictions that were inconsistent with the bank's duties as trustee.

The beneficiaries rely heavily on section 11.1–2 of InterFirst's trust division policies and procedures which provides:

Loan relationships—Sale of Closely Held Equity Position:

An offer, by a customer of the bank, to purchase an equity position in a closely held business held by the bank in a fiduciary capacity, shall be considered and evaluated by Business Interests Department on the same basis of merit as all other offers unless, and until, a commercial division of the bank is requested to provide all or part of the prospective purchaser's financing for the transaction. To have bank personnel representing customers on both sides of a transaction would place the bank in an untenable position of conflicting interests and thus expose the bank to possible charges of self-dealing. Business Interests Department Head shall immediately report the development of any such, or similar situation to his Group Head and/or Division Head.

The beneficiaries contend that this "outlawed" what the bank did. However, the fact that Southwest Pump Company used its own money, and then went to the bank to replenish the fund, would eliminate the conflict mentioned in this section. Thus, Southwest Pump Company was not in position to have to get the commercial section of the bank to approve the purchase prior to the purchase being made.

The beneficiaries point out that the bank charged a $6,000 fee in connection with the sale of the stock. However, there is no

contention that this fee was unreasonable, or that it was not comparable with the usual charge made for such services. The law recognizes the right of a trustee to a reasonable fee, and this does not indicate bad faith.

The beneficiaries complain that the trust department should have investigated why the dividends were down, and if they had done so they would have realized that Estes and others were getting some sizable bonuses. Again, this could be considered negligence, but there is no showing that the failure to do so was a result of bad faith. Under the terms of the will, the bank cannot be held liable for negligence. This type of exculpatory clause in a will is not void as against public policy. *Corpus Christi National Bank v. Gerdes*, 551 S.W.2d 521 (Tex.Civ.App.–Corpus Christi 1977, writ ref'd n.r.e.).

The beneficiaries offered in evidence some advertisements which InterFirst had placed in a brochure. They contend that these advertisements create an atmosphere of deceit. There is no showing that these advertisements existed at the time the settlor made the will or that any party in the suit relied on these advertisements. Therefore, they cannot be applied to establish damages for the beneficiaries.

The beneficiaries argue that InterFirst should have considered the possibility of dissolving the corporation inasmuch as a liquidation would have brought the beneficiaries more money than was obtained through the sale of the stock. There was no showing that this was a realistic possibility, because Article 6.03(A)(3) of the Business Corporation Act requires at least two-thirds of the outstanding shares of stock of the corporation must affirmatively vote for a voluntary dissolution.[24] Tex. Bus.Corp.Act Ann. art. 6.03 (Vernon 1980). The trustee held less than one-third of the outstanding shares of stock, being 32.28%, and it did not appear likely that the other

---

**24.** The grounds for an involuntary dissolution are set forth in Tex.Bus.Corp.Act Ann. art. 7.01 (Vernon 1980 and Supp.1987) and would not be applicable to the situation of Southwest Pump Company.

stockholders would want to join in a dissolution, because of the current success which the corporation was enjoying.

The beneficiaries point out that Sally Estes was provided with a copy of an appraisal on some real estate in which she owned an undivided interest[25] along with the undivided interest being held by the bank as trustee. This matter occurred after the sale was made, and while it shows cooperation, it does not prove a conspiracy. There was no evidence that this act was in any way detrimental to the trusts. The beneficiaries of the trust could have benefited if Sally Estes had found a purchaser who was also interested in purchasing the interest held by the trust.

The beneficiaries complain of InterFirst's role in the property being transferred from the first trustee to InterFirst as alternate trustee. They also complain of the contacts made with the Esteses during this period of time. The Esteses had an interest in seeing the trust property transferred to InterFirst as successor trustee, because they contended that the estate of Dr. Joe Risser owed money to the estate of R. Eugene Risser. (Sally Estes was the daughter of Eugene Risser and served as the executrix of his estate). Buster Cole, who was the successor executor for Joe Risser's estate and the attorney for Sally Estes in her capacity as executrix of the Eugene Risser estate, did not feel that he could properly pay this indebtedness. This was reason enough for the Esteses to be anxious to get the trust property transferred. The bank did not want to receive the assets until there was a court-approved accounting. The fact that, upon request, the bank furnished the attorney handling both estates the names of three attorneys in Dallas who did trust work does not show a conspiracy. None of these matters show a conspiracy or bad faith or self-dealing.

The beneficiaries contend that the bank secretly sold the stock to benefit itself and others. The records indicate that the bank did not get an outside appraisal of the stock, but this is not a violation of its own rules as the beneficiaries contend.[26] Clearly the bank would have been in a better position to argue the fairness of the price and its good faith if it had obtained an outside appraisal or tested the water by trying to obtain offers from other sources.

The InterFirst employees with the trust department took the position that they were not motivated by the wishes of the commercial department. There was some testimony regarding the "Chinese Wall" approach, which is calculated to prevent the flow of information between the trust department and the commercial department. This principle was devised primarily to prevent the passage of insider information from a corporation's commercial or other non-fiduciary departments to the trust department. Mueller, Einhorn and Gerstner, *Conflict of Interest Problems Facing the Bank As a Corporate Fiduciary*, 48 Tex.B.J. 525, 533 (1985); Herzel and Colling, *The Chinese Wall and Conflict of Interest in Banks*, 34 Bus. Lawyer 73 (1978).

Situations involving the conflicting motivations of the commercial loan department of a bank and the bank's trust department sometimes arise. For example, in the case of *Jefferson National Bank of Miami Beach v. Central National Bank in Chicago,* 700 F.2d 1143 (7th Cir.1983), the commercial department of the bank made loans to a corporation from which the bank's trust department held a promissory note for a beneficiary. The bank was found liable for losses by the beneficiaries, because it encumbered the corporate asset to secure its loans, but only after protecting

**25.** This undivided interest along with some other property was later traded to Southwest Pump Company by the Esteses for purchase of the shares of stock.

**26.** The bank rules require "use of outside professional services as required or indicated by circumstances. An example would be the use of appraisers to establish current value of assets carried on the books at an unrealistic cost or other basis. Real property, owned for a number of years, may have appreciated in value. Conversely, machinery may become obsolete more rapidly than it has been depreciated."

its own interest by obtaining the assets as security as a commercial lender, did the bank notify the settlor's family of the need to take action to protect their interest in the trust.

The president of InterFirst denied that InterFirst had such a Chinese Wall, but in any event, the evidence shows that information readily passed between the two departments. Furthermore, the fiduciary department was to evaluate the stock in the corporation, and such an evaluation included obtaining information about the indebtedness of the company. (Both departments actually made evaluations relating to Southwest Pump Company. The commercial department's analysis reflected optimism for the company's future, while the trust department's report was pessimistic.) Moreover, InterFirst does not contend that the commercial department was unaware that the trust department held shares of the corporation in trust. Therefore, for all purposes, we have to view the bank as a single entity.

Robin M. Kain, who was an assistant vice president of the bank and the loan officer in charge of the commercial loans to Southwest Pump Company at the time the transaction occurred, testified as follows:

Q. Were you aware, *prior to the stock sale, that as a result of that sale, Sally Risser Estes would have absolute voting control of the Southwest Pump Company?*

A. No.

Q. Mr. Estes in fact told you that it would cause no change, did he not?

A. No change in management, yes.

Q. Did he mention anything about voting control.

A. Not to my knowledge.

Q. You knew at that time there was no single majority shareholder? No shareholder owning more than fifty percent of the stock; is that correct?

A. That is correct? (sic)

Q. You also knew that this stock was going to be purchased by the company as treasury stock?

A. That's correct.

Q. And taken out of circulation, so to speak?

A. Yes.

Q. Did Mr. Estes offer you any further information during this conversation about the ultimate expected disposition of that stock that was going to bought by the Southwest Pump Company?

A. No.

Q. Did you have any concern at all about this stock transaction, about control of the company going out of the Risser family?

A. I had concern about the transaction in two areas. *Number one, what would it cost, and number two, would, as a result of the transaction, would management change.*

Q. *You didn't want it to cost too much did you?*

A. *No.*

Q. That would not be in the best interest of the Southwest Pump Company?

A. Not in my opinion.

Q. And might interfere with the ability of the company to repay its loans if it used money to buy stock?

A. *It might interfere with the ability of the company to repay its loans period.*

Q. Do you know whether or not the Southwest Pump Company borrowed a portion of the purchase price to buy this stock?

A. I know they did not.[27]

(Emphasis added.)

This testimony supplies a motivation for InterFirst to sell the stock to Southwest Pump Company at a price significantly less than the fair market value.

Not every case that appears to involve self-interest is construed to be a breach of

---

27. The evidence indicates that Southwest Pump Company used available funds for the purchase of the stock and then replenished these funds through a bank loan from InterFirst.

trust. In the case of *Humane Society of Austin and Travis County v. Austin National Bank, supra,* the Texas Supreme Court held that a bank serving as executor of an estate which invested $883,000 of the estate's money in its own certificates of deposit was not in furtherance of its own self-interest to the detriment of the estate. The Court found that while other lending institutions might have offered higher interest rates, the bank could not have obtained one hundred percent security by investing the estate's funds in certificates of deposit in other financial institutions, and inasmuch as the primary duty of the executor is preservation of the estate, there was no violation of fiduciary duties.

 Mere evidence of some disparity between the value that the trust realized in disposing of trust property and the fair market value at the time of that disposition, as later independently appraised, is not alone sufficient to establish a fiduciary breach on the part of the trustee. As Judge Learned Hand wrote on behalf of the court in *Dabney v. Chase National Bank of City of New York,* 196 F.2d 668 (2d Cir.1952): "The law ought not make trusteeship so hazardous that responsible individuals and corporations will shy away from it."

On the other hand, when the difference between the market value and the price obtained is an excessive variation, this may be considered as some evidence of bad faith. In the case of *Daniel v. Irwin,* 250 S.W. 254 (Tex.Civ.App.–Dallas 1923, writ ref'd), the court was dealing with a sale of land by a trustee. The jury made a finding that the market value of the property was $22,000, and the trustee had sold the property for approximately $6,000 less than its market value. The court held that the substantial difference between the market value of the property and the price for which it was sold prohibited the court from saying that the trustee had acted in good faith. In the case of *Coast Indian Community v. United States,* 213 Ct.Cl. 129, 550 F.2d 639 (1977), the court held that a

showing that the value realized from the trust property was so far below its fair market value (5% of the fair market value) as to constitute fraudulent conduct will suffice, without more, to establish the trustee's liability.

 In the present case, if InterFirst had sold the stock to Southwest Pump Company at fair market value, there would have been no damage to the beneficiaries. If InterFirst had made a diligent effort to get the best price possible for the stock by publicizing its sale, by notifying the beneficiaries, by getting an outside appraisal, and by then accepting the highest offer, its actions would not have been in bad faith. If InterFirst had not been in the position of obtaining an advantage for itself as a lender to Southwest Pump Company, a self-serving motive could not be inferred from the situation. But the combination of these three factors presents circumstances evincing bad faith and self-dealing to the detriment of the beneficiaries of the trusts.

The same evidence which was offered to support bad faith also supports self-dealing. The circumstances surrounding the sale show that the trustee did not put forth a proper effort to obtain the best price possible for the stock. The price of one-third of the market value is a fact from which inferences of bad faith and self-dealing can be drawn. The trustee admits that the self-serving motive existed to the extent that the bank did not want the stock to cost Southwest Pump Company too much, nor did the trustee want to see a sale of the stock made which could result in a change in the management of Southwest Pump Company. Thus, the jury had a basis from which to conclude that the trustee acquired a gain by reason of its trusteeship. Under these circumstances, we find sufficient evidence in the record to uphold the jury's finding on both bad faith and self-dealing.

## REQUESTED JURY INSTRUCTIONS

InterFirst argues that the trial court erred in admitting evidence of matters not

relevant to a case involving a breach of fiduciary relations and in refusing instructions which InterFirst submitted for inclusion in the jury charge. InterFirst does not argue that error was committed by admission of any specific evidence under this point, but rather that the trial court erred in not restricting the jury's consideration of these matters by the requested instructions.

■ The trial judge has a wide discretion in the submission of special issues and instructions to the jury. *Mobil Chemical Co. v. Bell*, 517 S.W.2d 245 (Tex.1974). The standard of review of a trial judge's instruction to the jury is that an error on instructing or failing to instruct must have caused or can be reasonably calculated to have caused the rendition of an improper verdict. *Minchen v. Rogers*, 596 S.W.2d 179 (Tex.Civ.App.–Houston [1st Dist.] 1980, no writ).

■ InterFirst complains of the failure to instruct the jury that the trustee had a duty to keep the trust productive and to sell nonproductive assets. This was an unnecessary instruction, because InterFirst's duty and right to sell the stock were not contested anywhere in the proceedings. The matters in controversy were the method of the sale, the amount of the purchase price, and the allegation of favoritism toward the purchaser.

InterFirst complains also of the trial court's failure to instruct the jury that InterFirst had no duty to consult with the beneficiaries before selling the stock. We do not believe this to be a proper instruction as a matter of law, but this is a factual matter for the jury to consider on the issue of bad faith.[28]

InterFirst further complained of the trial court's refusal to instruct the jury on the customary practices of the bank trust department and of the prohibition by federal regulation of exchanging information between the trust department and the commercial department. This is urged by InterFirst in view of the beneficiaries' arguments that the bank knew what its employees knew. In this case there was specific evidence of exchange of information between the departments in various forms. The bank as a corporate entity could only know what its employees knew. Whether or not there was an exchange of information between the departments was a question of fact in this case, and not a matter that required an instruction to the jury.

Reviewing each of the issues, we find that each one is tied to the bank's sale of the stock in controversy, and therefore the issues are properly restricted to conduct relating to the stock sale. For example, Special Issue 1 was worded as follows:

Did the Interfirst Bank Dallas, N.A., Trustee, in selling the 968.5 shares of stock to Southwest Pump Company, Inc. on December 19, 1980, act in bad faith as that term is defined herein?

Answer "Yes" or "No".

We find that the trial court properly instructed the jury and properly defined the terms used in the charge (except as we discussed elsewhere in this opinion). Definitions should not be given when a term is not used in the charge and when the definition is not necessary to the jury's consideration of other issues. *Cottrell v. Texas Employers' Ins. Assn.*, 293 S.W.2d 219 (Tex.Civ.App.–San Antonio 1956, writ ref'd n.r.e.). We further find that failure to include the instructions requested by Inter-

---

**28.** In the case of *Allard v. Pacific National Bank*, 99 Wash.2d 394, 663 P.2d 104 (1983), the Supreme Court of Washington held that a trustee must inform the beneficiary of all the material facts in connection with the non-routine transaction which significantly affects the trust estate and the interest of the beneficiary prior to the transaction taking place. The Washington Court went on to hold that the duty to inform was particularly required in that case where the only asset of the trust was the property involved. In the present case, the stock was not the only asset of the trust, but it was the largest asset in the trust. While Texas law does not require the consent of the beneficiaries before selling trust assets, the fact that the property is in a trust does not require that the beneficiaries are to be kept in ignorance of the administration of the trust.

First did not cause nor can it be reasonably calculated to have caused the rendition of an improper verdict.

## EXEMPLARY DAMAGES

InterFirst brings points of error contending that the trial court erred in granting exemplary damages for the following reasons: (1) the issue was not properly conditioned on a finding of wrongdoing; (2) there was no finding of intentional misconduct; (3) there was no evidence or there was insufficient evidence of intentional misconduct; (4) the amount of exemplary damages awarded was excessive; and (5) the jury was permitted to include amounts for attorney's fees and inconvenience without presenting evidence of either.

 Texas courts have long recognized that exemplary damages are recoverable when the injury is tainted with fraud, malice, *or* willful wrong. *Cole v. Tucker*, 6 Tex. 266 (1851). The rule allowing exemplary damages when it is shown that a defendant committed a willful, malicious or fraudulent wrong is one of general application. It is recognized by common law and is not dependent upon statute. *Briggs v. Rodriguez*, 236 S.W.2d 510 (Tex.Civ.App.–San Antonio 1951, writ ref'd n.r.e.). The issue concerning exemplary damages for breach of a fiduciary duty is not whether there is an intention to injure, but rather whether the one with a fiduciary duty intended to gain an additional benefit for himself or herself. *International Bankers Life Insurance Co. v. Holloway*, 368

S.W.2d 567 (Tex.1963); *Kirby v. Cruce*, 688 S.W.2d 161 (Tex.App.–Dallas 1985, writ ref'd n.r.e.); *Russell v. Truitt, supra.* Thus, malice is not a required element when there is an intentional breach of a fiduciary duty.[29] The Supreme Court found in *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502 (Tex.1980), that exemplary damages are proper when self-dealing by a fiduciary has occurred.

 We recognize that exemplary damages are not recoverable for a breach of contract. However, an intentional breach of a fiduciary duty is a tort justifying the award of exemplary damages. *Douglas v. Aztec Petroleum Corp.*, 695 S.W.2d 312 (Tex.App.–Tyler 1985, no writ). It is not necessary that the tort and the contract arise out of separate and distinct transactions. A breach of confidence may be a breach of contract as well as a tort. *Crutcher-Rolfs-Cummings, Inc. v. Ballard*, 540 S.W.2d 380 (Tex.Civ.App.–Corpus Christi 1976, writ ref'd n.r.e.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977). In the present case, the sale of the stock for approximately one-third of the fair market value was a breach of the contractual obligation of the bank, and such a breach, when accompanied by bad faith and self-dealing is a tort. We find sufficient evidence to support the jury's findings on these issues. We further find that there is sufficient evidence for the jury to make an inference of an intentional wrong.

The combination of factual determinations by the jury finding bad faith and

**29.** *Ogle v. Craig*, 464 S.W.2d 95 (Tex.1971), has been cited for the proposition that additional elements are essential to recovery of exemplary damages. This argument was addressed in *Christopher v. General Computer Systems Inc.*, 560 S.W.2d 698 (Tex.Civ.App.–Dallas 1977, writ ref'd n.r.e.). That court reconciled *Ogle* and *Holloway* by keying on the basic difference between these cases. *Ogle* was treated, both by the deciding court and later opinions which cited it as authority, as a conversion case in which the wrongful taking was the basis for the claim of exemplary damages. In that case a mere wrongful activity without more was held insufficient to support exemplary damages.

*Holloway* specifically addressed a breach by a fiduciary, stating that,

> [T]he rule allowing exemplary damages where the defendant acted wilfully, maliciously, or fraudulently is one of general application.
> ....
> The acts of the defendant (breach of fiduciary duty) are acts which equity considers to be wilful and fraudulent, *regardless of what may have been the actual motive of the defendants.* (Emphasis added).

The court in *Christopher* correctly used the measure set by *Holloway* in holding that such a willful tort is sufficient to support an award of exemplary damages.

self-dealing accompanying the finding of a gross inadequacy of sale price constitutes intentional conduct which makes this an appropriate case for levying exemplary damages. We have previously discussed the evidence upon which these findings were based.

Although the finding of exemplary damages by the jury should have been predicated upon the finding of bad faith and self-dealing, the fact that it was not so predicated is harmless error in light of the jury's findings on those issues. There was further error in the manner in which this issue was submitted, inasmuch as the jury was instructed that exemplary damages could be awarded "in addition to any amount which may be or has been found by you as actual damages." This is erroneous because the jury had not been asked to find any actual damages, but instead were asked to determine the fair market value of the 968.5 shares of stock of Southwest Pump Company on the date that they were sold by the trustee to Southwest Pump Company. However, this instruction precluded the jury from including any actual damages in this answer, and thus we do not find that it resulted in harmful error. Tex.R.App.P. 81(b)(1).

InterFirst complains of the provision in the charge allowing the jury to consider inconvenience and attorney's fees as a part of any exemplary damages which were awarded. InterFirst bases its complaint on the failure of the beneficiaries to offer any evidence concerning attorney's fees. The inclusion of compensation for inconvenience and reasonable attorney's fees as part of exemplary damages was approved in *Allison v. Simmons*, 306 S.W. 2d 206 (Tex.Civ.App.–Waco 1957, writ ref'd n.r.e.), and *Hofer v. Lavender*, 679 S.W.2d 470 (Tex.1984).

In the case of *Donnel v. Lara*, 703 S.W. 2d 257 (Tex.App.–San Antonio 1985, writ ref'd n.r.e.), the attorney's fees were proved up in order to have them considered as a part of the exemplary damages. In the case of *Planet Plows, Inc. v. Evans*, 600 S.W.2d 874 (Tex.Civ.App.–Amarillo 1980, no writ), the amount of the attorney's fees were proved up in order to have them included for consideration in the exemplary damages. In the case of *Dahl v. Akin*, 645 S.W.2d 506 (Tex.App.–Amarillo 1982), *aff'd*, 661 S.W.2d 917 (Tex.1983), evidence of attorney's fees and legal expenses were introduced for the jury's consideration on exemplary damages.

Although there are numerous cases allowing attorney's fees to be considered as a part of exemplary damages and some of these cases refer to evidence on the subject, we have found no Texas cases which require the introduction of evidence in order for the jury to consider this element. While we think the better approach is to give the jury guidance by introducing evidence as to attorney's fees, we do not find that to be a requirement of the law.

The Supreme Court of Kansas in *Brewer v. Home-Stake Production Co.*, 200 Kan. 96, 434 P.2d 828 (1967), held that it was not necessary to prove up attorney's fees for them to be considered for exemplary damages, and quoted the case of *Titus v. Corkins*, 21 Kan. 722 (1879):

They [attorney's fees] are not stated to the jury as matters which must be made the basis of compensation, but are suggested as proper for their consideration; and, as influencing the amount of smart-money, they are eminently proper.... Counsel say that there was no testimony as to the expenses, and therefore the court improperly referred to the matter. If these expenses were the basis of compensation, then testimony as to them would be necessary, and the plaintiff could recover only what he should prove he has incurred. But it is otherwise in reference to smart-money. The jury are aware that a suit is prosecuted; they know that time, labor, and money are consumed in such a suit, and, from what they see, have some idea of the amount of such time, labor, and money. And, though they may not know exactly such amount, it is right for them to consider

the matters of such time, labor, and money in fixing the amount of smart-money.

As to the element of inconvenience, this can be drawn from the circumstances in the case. We overrule the point of error based on the lack of evidence of attorney's fees and inconvenience.

 Exemplary damages must be reasonably proportioned to actual damages, but there can be no set formula for the ratio between the amount of actual and exemplary damages. This determination must depend upon the facts of each particular case. Factors which are to be considered in determining whether an award of exemplary damages is reasonable include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981).

Exemplary damages must bear a reasonable relationship to the amount of actual damages. In the present case, the exemplary damages amount to approximately 7½ times the actual damages, which does not violate the reasonable relationship test.

Pursuant to Tex.R.App.P. 85,[30] if we are of the opinion that the trial court abused its discretion in refusing to suggest a remittitur and we find that the cause should be reversed for that reason only, then we must indicate to the party or his attorney when he may file a remittitur of such excess.

 Considering the five factors set forth by the Supreme Court in the *Alamo National Bank* case (as further discussed in the concurring opinion), as well as the amount of exemplary damages which is necessary and proper to serve the purposes

of punishment and deterrence, we find the amount of $10,000,000 to be excessive and that the trial court abused its discretion in not suggesting a remittitur. We find that exemplary damages in the amount of $2,678,750 are sufficient to satisfy the purpose of punishment of this trustee, of deterrence as to all trustees, and for encouragement of victims to bring legal action.

Therefore, if within thirty days from the date of this opinion, the beneficiaries file in this Court a remittitur of $7,321,250, the judgment of the trial court will be reformed, and the award of $2,678,750 in punitive damages will be affirmed. Otherwise, the cause will be reversed and remanded.

CORNELIUS, Chief Justice, concurring.

I concur in the disposition of this case, but write separately to elaborate on the reasons why we, in the exercise of our exclusive fact jurisdiction[1], find the punitive damages excessive.

In judging the reasonableness of punitive damages, we consider the nature of the wrong, the character of the conduct involved, the degree of the wrongdoer's culpability, the situation and sensibilities of the parties, and the extent to which the conduct offends a public sense of justice and propriety. *Alamo National Bank v. Kraus,* 616 S.W.2d 908 (Tex.1981).

The award of $10,000,000.00 punitive damages is clearly excessive and supported by insufficient evidence when judged by those standards. The injury in this case was purely financial. Unlike personal injury cases where monetary damages cannot replace a lost life or restore a maimed body, the actual damage award here makes the injured parties completely whole, except for attorney's fees and inconvenience. The bank's conduct, although it could

---

**30.** At the time of trial, the applicable rule was Tex.R.Civ.P. 440.

**1.** Excessiveness of punitive damages is a fact question on which the Court of Appeals' deci-

sion is final. *Wilson v. Freeman,* 108 Tex. 121, 185 S.W. 993 (1916); *Cotton v. Cooper,* 209 S.W. 135 (Tex.Comm'n App.1919, opinion adopted).

amount to a breach of its fiduciary duty, did not involve criminal or even malicious acts, nor did it produce any direct benefit to the bank at appellees' expense. The justification for imposing punitive damages upon a defaulting fiduciary usually is that it would not be right to merely require the fiduciary to return "his ill-gotten gains." *See International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963). In this case the bank has no "ill-gotten gains" to return; instead the very substantial actual damages will come from its own pocket. The evidence of bad faith and self-dealing in this case is tenuous at best. Although we have found such evidence sufficient to support the jury's findings, it barely rises to the level required to impose liability. There was no mental or physical abuse, personal outrage, insult or opprobrious conduct calculated to injure appellees' sensibilities. Indeed, there is considerable evidence that the bank tried to act according to good business practices. And, although we may say that the public policy of the state is violated when a trustee breaches his duty, when the actual damage recovery for such breach is as large as it is in this case, punitive damages twice that award are manifestly ample to punish the wrongdoer and assuage the "public outrage."

Considering the evidence in the light of the foregoing facts, an award of $10,000,000.00 in punitive damages is such as to shock the conscience of the court and indicate that the award was the result of passion and an attempt to grant an unjustified windfall to appellees, rather than the result of an objective assessment of evidence in order to accomplish the purposes of punitive damages.

BLEIL, Justice, dissenting.

My primary disagreement is with the majority's decision that InterFirst did something for which liability for punitive damages attaches. I also disagree with the majority's conclusion that there is sufficient evidence to support a "bad faith" finding. For clarity's sake, I address the sufficiency of the evidence issue first.

## SUFFICIENCY OF THE EVIDENCE

The conclusion of a dissenting justice with regard to the sufficiency of the evidence may be of marginal value because, as the majority is well aware, courts of appeals are the final authority on fact questions. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Texas L.Rev. 361, 368 (1960). Nevertheless, conscience compels me to assail the majority's conclusion that the evidence sufficiently supports a finding of a "bad faith" breach of duty on the part of InterFirst, which gives rise to punitive damages.

The majority sorts through thousands of pages of the statement of facts before keying in on a few sentences which it concludes, without explanation, support the findings of self-dealing and bad faith. However, before it arrives at this conclusion, the majority opines that:

There was no statutory self-dealing.

The fact that InterFirst lent money to Southwest Pump did not constitute self-dealing or bad faith.

The restrictions on Southwest Pump's dividend payments did not form a part of an alleged "conspiracy to force the sale of the stock."

Minor gifts of pecans to InterFirst, and dove hunts, and luncheon dates by bank officers with William and Sally Estes do not show any neglect by the bank of its fiduciary duty.

The fact that Sally Estes wished to buy additional stock in Southwest does not show bad faith on InterFirst's part.

The loan restrictions placed on Southwest Pump were not inconsistent with InterFirst's duties.

The charging of a $6,000.00 fee for the sale of stock did not indicate bad faith.

InterFirst's advertising brochure does not establish any deceit on its part.

Furnishing certain real estate apprais-
als was not detrimental to the trusts.

InterFirst's furnishing the names of
three Dallas trust attorneys did not evi-
dence self-dealing or bad faith.

After setting forth all of this "non-breach-
ing" conduct on the part of InterFirst, the
majority appears to focus on part of Robert
Kain's testimony quoted in its opinion.
The majority, in effect, says, "Aha! This is
the malevolent evidence."

As stated by the majority, no "Chinese
Wall" existed between the departments of
InterFirst. But realism must enter into
our review of the evidence. Surely we
must consider that Robert Kain, a former
loan officer, knew nothing about the sale of
the stock until six months after the sale,
and provided no input into the decision to
make the sale. Had a trust officer, or
some other officer involved in the sale of
the stock, said the bank sold the stock
because of an improper motive, I could
more easily join in the majority's "Aha."
However, it is not so easy when the "Aha"
evidence takes the form of an opinion of a
former loan officer who had nothing to do
with the sale of the stock by the trust
department, who in fact did not know about
the sale of stock until several months after
its sale. Would the majority still cling to
Kain's testimony had he been a janitor or
elevator operator? A janitor would have
known just as much about the sale of the
stock as did Kain.

In light of all the evidence, Kain's opin-
ion plus the circumstances surrounding the
sale are not enough to prove any intent
required to show bad faith. I fully agree
with the concurring opinion that the evi-
dence of bad faith and self-dealing is "tenu-
ous at best" but I fail to see that this same
evidence "barely rises to the level required
to impose liability." The majority abdi-
cates its duty to find the evidence in this
case insufficient. If it cannot find the evi-
dence insufficient under the facts of this
case, it is difficult to imagine an instance in
which it could find the evidence insuffi-
cient.

## PUNITIVE DAMAGES

My other primary disagreement with this
decision centers on the issue of exemplary
damages. I am persuaded by my review of
this case that the law does not authorize an
award of punitive damages in this instance.
In attempting to articulate my difference
of opinion with the majority, I find that the
majority neglects to set out what is re-
quired to justify the imposition of punitive
damages.

Because the majority seems unclear
whether this action is in the nature of one
based on a contract, a tort, or equity, it is
understandable that the basis of the major-
ity's decision on punitive damages is nebu-
lous. An action for breach of a fiduciary
duty has commonly been treated as an ac-
tion sounding in tort, contract and equity.
*See* D. Dobbs, *Remedies* § 10.4, at 684
(1973). Recently a sister court of appeals
held that "[b]reach of fiduciary duty is a
tort." *Douglas v. Aztec Petroleum Corp.*,
695 S.W.2d 312 (Tex.App.–Tyler 1985, no
writ). The *Aztec* decision provided no basis
for its statement, which is so readily em-
braced by today's majority. I believe that
the basis of the majority's punitive damage
decision is this: InterFirst's conduct, an
intentional breach of a fiduciary duty, was
a simultaneous breach of contract and a
tort.

The majority errs in two fundamental
areas concerning punitive damages:

### I.

*Absence of a Jury Finding of Indepen-
dent Tort Precludes Recovery of
Punitive Damages*

Punitive damages are not recoverable in
a breach of contract case even where the
contract has been breached maliciously.
*Amoco Production Co. v. Alexander*, 622
S.W.2d 563 (Tex.1981). Thus, a distinct
tort, separate and apart from the malicious
breach of the contract, must be pled and
proved. *Texas Nat. Bank v. Karnes*, 717
S.W.2d 901 (Tex.1986); *Texas Power &
Light Co. v. Barnhill*, 639 S.W.2d 331 (Tex.

App.–Texarkana 1982, writ ref'd n.r.e.). While it is not necessary for a tort and the contract to arise out of separate and distinct transactions, *Barnhill,* 639 S.W.2d at 334, this does not change the well-established rule that the tort must be an independent one, and must be found by the jury as such. *International Bank, N.A. v. Morales,* 736 S.W.2d 622 (1987); *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex. 1986). The jury did not find—nor was it asked to find —that the breach was accompanied by an independent tort. Therefore, the punitive damages are not allowable.

1. In this case limitations was pled, and as a matter of law, more than two years had elapsed between the 1980 stock sale and the 1984 suit filing. Although limitations is ordinarily a fact question, the two-year statutory period may be shown so conclusively that it is established as a matter of law. *Cf. Texas & N.O.R. Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522 (1947).

2. Originally the plaintiffs alleged the following cause of action:

CONSPIRACY

26. Prior to December 19, 1980, InterFirst acting by and through certain of its officers and employees, specifically defendants Nelson and Landrum, entered into a concert of action and conspiracy with Sally R. Estes, William C. Estes and J.J. French, Jr.

27. The purpose of the conspiracy was to place under the ownership and control of Sally R. Estes the 968.5 shares of stock held by the two trusts which are the subject of this litigation.

28. The defendant-conspirators undertook to accomplish their purpose by illegal means, i.e., to obtain the trusts' 968.5 shares of stock for the benefit or control of Sally R. Estes without paying fair value therefor and to do so as secretly and clandestinely as possible so as to avoid detection.

29. The purpose of the conspiracy was fulfilled and the conspirators were successful. As a result, the trusts were damaged in an amount of at least $3,300,000 plus interest thereon.

30. The conspirator defendants acted with actual malice, or alternatively, with reckless disregard for the interests of the trusts and the beneficiaries, and the plaintiff beneficiaries are entitled to recover exemplary damages from all defendants, jointly and severally, which they seek in the amount of $40,000,000.

31. In the alternative, plaintiffs allege that their injury occurred at the date the conspiracy culminated, i.e., November 10, 1981,

II.

*No Pleading of Intentional Tort and Limitations Precludes Any Recovery for Intentional Tort*

When suit was filed against InterFirst, many causes of action were pled against it. It pled as an affirmative defense the applicable statutes of limitations.[1] Thereafter and prior to trial, the allegations of the intentional torts of conspiracy and fraud were nonsuited.[2]

Because the sale of stock was in December 1980, and suit was not filed until Au-

when the fair market value for the 968.5 shares of stock acquired on that date by Sally Estes was at least $7,000,000. Should it be determined, for whatever reason, that Southwest Pump Company nor its minority shareholders as a result of the transactions whereby Southwest Pump Company, acting under the illegal domination and control of Sally R. Estes and William C. Estes acquired the 968.5 shares of stock and thereafter, again acting under the illegal domination and control of Sally R. Estes and William C. Estes, sold said stock to Sally R. Estes in her capacity as independent executrix, then plaintiffs are entitled to recover for the trusts the difference between the actual fair market value on the date Mrs. Estes acquired the stock and the value originally paid.

FRAUD

32. Defendants' entry into the combination and conspiracy described in paragraphs 26 through 31, above, constituted fraud in a transaction involving the stock in a corporation, in violation of § 27.01 of the Business and Commerce Code of Texas. Plaintiff beneficiaries and the trusts have been defrauded.

33. As a result of the fraud committed by defendants, the trusts have suffered damages in an amount of at least $3,300,000, or in the alternative, at least $6,500,000.

34. Pursuant to the provisions of § 27.01(c), Texas Business and Commerce Code, plaintiffs as persons defrauded, are entitled to recover exemplary damages not to exceed twice the amount of actual damages, or at least $6,600,000, from the defendants jointly and severally, or in the alternative, $13,000,000.

In taking their nonsuit, the plaintiffs moved as follows:

PLAINTIFFS' NON–SUIT AS TO CERTAIN CLAIMS

Sara M. Risser, et al., plaintiffs, hereby move to dismiss and do non-suit the following claims only that said plaintiffs have pleaded in their Original Petition:

(a) Conspiracy, as set forth in paragraphs 26, 27, 28, 29, 30 and 31 of the Original Petition;

gust 1984, it seems almost a certainty that the attorneys nonsuited the intentional tort actions of conspiracy and fraud because as a matter of law those actions were barred by the two-year limitations period in Tex. Civ.Prac. & Rem.Code Ann. § 16.003 (Vernon 1986). Strangely, although the intentional torts were abandoned before trial, this Court resurrects an unnamed intentional tort as the sole basis for upholding punitive damages.

In addition to the above two specific reasons why punitive damages are not properly allowable, I also disagree with the rationale given by the majority to support the award of punitive damages. The majority seems to rest its decision on the case of *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502 (Tex.1980), which it cites for the proposition that exemplary damages are proper when an intentional breach of fiduciary duty has occurred. *Moore* dealt only slightly with the issue of punitive damages. The fact situation was vastly different than the one now before this Court. Moore was found to have overreached his aunt, Maggie Littell, during the last years of her life, at a time when she was confused and in ill health. Moore took possession of much of her estate and "handled the affairs" of Littell. Littell relied and depended upon her nephew. After Littell died, Moore claimed that she had intended to give him the property he had managed for her, including her bank accounts and personal jewelry.

The court held that "a fiduciary relationship was established as a matter of law under the undisputed evidence in this record; and, secondly, that the presumptive unfairness and invalidity of the transactions in question stand unrebutted in any respect by Moore." The Supreme Court held on the issue of punitive damages:

> We also disagree with the Court of Civil Appeals in the reversal of the award of exemplary damages in the sum

of $5,000 as found by the jury. This follows from our conclusion that Moore did not overcome the presumption that his self-dealing with the funds of Mrs. Littell was unfair, and that the case of the Bank against Moore as a breaching fiduciary is established by this record. As we said in *International Bankers Life Ins. Co. v. Holloway, supra,* in recognizing the right to a recovery of exemplary damages, "[w]e should not say to defaulting fiduciaries that the most for which they can be held accountable in equity are the profits which would have remained theirs had they not been called to account." *Id.* at 584.

*Moore* does not require that punitive damages be recovered in all cases, or in this case.

The *Moore* decision, as well as the intermediate appellate court decision (*Moore v. Texas Bank and Trust Co.*, 576 S.W.2d 691 (Tex.Civ.App.–Eastland 1979), *rev'd,* 595 S.W.2d 502 (Tex.1980)), which it reversed, makes it clear that the focus of that case was on presumptions, not damages. When a fiduciary relationship is established, a presumption arises that a gift from the principal to the fiduciary is unfair and invalid. The Supreme Court reversed the Court of Civil Appeals on the ground that a fiduciary relationship had been established as a matter of law by undisputed evidence, and the bank did not need to submit an issue on breach of the fiduciary duty because Moore had failed to overcome the presumption of unfairness. Punitive damages had been reversed by the Court of Civil Appeals because it found that the bank had failed to maintain its cause of action; the Supreme Court, in finding that the bank had set forth a cause of action, reinstituted the action for punitive damages. The malice in *Moore* lay in the unrebutted presumption of unfairness in a situation involving a gift from a principal to a fiduciary. That situation does not exist here.

(b) Fraud, as set forth in paragraphs 32, 33 and 34 of the Original Petition; and

(c) Constructive Trust, as set forth in paragraph 37 and in the prayer of the Original Petition.

What, then, is the applicable law? That is a difficult question to answer. Cases such as *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981), have shed light on the question of when punitive damages are allowed based upon gross negligence. However, that type of case does not assist us here because we are not dealing with gross negligence. We must look to other types of punitive damages cases.

Punitive damages are allowable when the wrongful act is willful, malicious or fraudulent. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex.1963). However, the fact that an act is unlawful is not by itself a ground for an award of punitive damages. Rather, the act complained of must not only be unlawful or wrongful, it also must partake of a wanton and malicious nature. *Ogle v. Craig*, 464 S.W.2d 95 (Tex.1971); *Killian v. Trans Union Leasing Corp.*, 657 S.W.2d 189 (Tex.App.–San Antonio 1983, writ ref'd n.r. e.).[3]

A recent case seems to reaffirm the *Moore* holding. In *Manges v. Guerra*, 673 S.W.2d 180 (Tex.1984), the Supreme Court upheld exemplary damages against Manges, holding that "[r]ecovery against a breaching fiduciary is not limited to an accounting of profits received by the fiduciary, but can also include exemplary damages." *Manges*, 673 S.W.2d at 184.

There seems to be a common thread in the breach of fiduciary duty cases—malice. In *Manges*, the jury found that he "willfully, wantonly, maliciously and unconscionably breached his fiduciary duty." *Mang-*

es, 673 S.W.2d at 184–185. In *Holloway*, the jury found that "the defendants acted with malice." *Holloway*, 368 S.W.2d at 584. The thread of malice does not tie into the facts of our case or the conduct of InterFirst.

It is unfortunate that the majority does no more than pay lip service to Learned Hand's belief, "[t]he law ought not make trusteeship so hazardous that responsible individuals and corporations will shy away from it." *Dabney v. Chase Nat. Bank of City of New York*, 196 F.2d 668 (2d Cir. 1952). The majority's decision achieves precisely what it says the law ought not.

---

3. In *Ogle v. Craig*, 464 S.W.2d 95 (Tex.1971), the contention was made that a breach of fiduciary duty under circumstances showing bad faith was sufficient grounds for assessing punitive damages because bad faith amounts to "fraud and/or malice." This contention was rejected by the Supreme Court: "acts violative of the rights of another may be said to be wrongful and, indeed, may be motivated by bad faith and improper motive. But there must be more to support legal redress to the extent of the punishment implicit in the assessment of punitive damages." *Ogle*, 464 S.W.2d at 98.

In *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex.1963), certain officers

of a corporation conspired to realize a personal profit from corporate transactions and to sell personally owned corporate stock in competition with the sale of the corporation's own stock. In addressing the exemplary damages issue, the Supreme Court stated that "[t]he acts of the defendants supporting the recovery are acts which equity considers to be wilful and fraudulent, regardless of what may have been the actual motive of the defendants; here, of course, the jury has found that the defendants acted with malice." *Holloway*, 368 S.W.2d at 584. *Holloway* does not say that punitive damages attach for all breaches of fiduciary duty, no matter what that breach might be.